**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| SABATINO BIANCO, M.D., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 2:12-CV-00147-WCB |
| | § | |
| GLOBUS MEDICAL, INC., | § | |
| | § | |
| Defendant. | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Following the trial in this case, the jury found that defendant Globus Medical, Inc., had

misappropriated trade secrets belonging to the plaintiff, Sabatino Bianco, M.D.  The trade secrets

in question consisted of ideas for the design of a medical device known as an adjustable

intervertebral spacer or implant.   Intervertebral spacers are used in spinal surgery to replace

damaged discs in patients' spines.  In assessing damages, the jury rejected Dr. Bianco's request

for disgorgement of Globus's profits on the devices that allegedly embodied the misappropriated

trade secrets, but awarded him reasonable royalty damages in the amount of $4,295,760.  That

sum constituted 5% of the total "net sales" that Globus had earned prior to trial on the three

intervertebral spacers that were the subjects of the litigation, the Caliber, Caliber-L, and Rise

devices.[1]

---

[1]  The evidence at trial showed that Globus used the term "net sales" to refer to total sales minus several categories of variable costs, including the cost of the goods, sales commissions, taxes, transportation and related charges, rebates, discounts, and license fees.

In response to post-trial motions, the Court denied Dr. Bianco's request for a permanent injunction but granted his request that the Court consider an ongoing royalty on the Caliber, Caliber-L, and Rise products in lieu of an injunction (Dkt. No. 269).  The Court gave the parties 30 days within which to attempt to agree on an appropriate ongoing royalty rate.  When that 30-day period expired, the parties notified the Court that they had reached impasse.  The Court then held an evidentiary hearing on the issue of the ongoing royalty sought by Dr. Bianco.  After analyzing the evidence at trial and at the evidentiary hearing, and after reviewing post-hearing briefs submitted by the parties, the Court now grants Dr. Bianco an ongoing royalty of 5% on Globus's future sales of its Caliber, Caliber-L, and Rise products for a maximum  period of 15 years from July 1, 2007.

I

In patent cases in which a permanent injunction is sought, the Federal Circuit has held that a district court may impose a reasonable royalty on the defendant for future use of the patented invention in lieu of an injunction.  Paice LLC v. Toyota Motor Corp., 504 F.3d 1293, 1315 (Fed. Cir. 2007); see also Telcordia Techs., Inc. v. Cisco Sys., Inc., 612 F.3d 1365, 1378-79 (Fed. Cir. 2010).  Before setting an ongoing royalty rate for future infringement, however, the district courts have been instructed to allow the parties time to negotiate an ongoing royalty amongst themselves.  See Paice, 504 F.3d at 1315 & n.15; id. at 1316-17 (Rader, J., concurring); see also Telcordia, 612 F.3d at 1379.  If those negotiations fail, the district court is permitted, in the exercise of its discretion and in light of its equitable powers, to assess a reasonable royalty in lieu of an injunction.  Paice, 504 F.3d at 1315; see also Presidio Components, Inc. v. Am. Technical Ceramics Corp., 702 F.3d 1351, 1363 (Fed. Cir. 2012); Whitserve, LLC v. Computer

2

Packages, Inc., 694 F.3d 10, 35 (Fed. Cir. 2012).   Although this case involves trade secret misappropriation rather than patent infringement, the two torts are sufficiently analogous that the Federal Circuit's decision in Paice, as supplemented by cases from the Federal Circuit and from this district that have applied Paice, provide an appropriate starting point for this Court in deciding whether to grant an ongoing royalty and what the amount of that royalty should be.

The Federal Circuit in Paice stated that calculating a reasonable royalty would be a matter for the sound discretion of the district court, but the circuit court has not had occasion to address in detail how a district court should go about exercising that discretion in setting an ongoing royalty.  In Amado v. Microsoft Corp., 517 F.3d 1353 (Fed. Cir. 2008), the district court had set a reasonable royalty to be paid by an adjudged infringer during the period that a permanent injunction was stayed pending appeal.  The district court in Amado had trebled the royalty found by the jury because, in the district court's view, any postjudgment infringing conduct would be willful.  The Federal Circuit rejected that analysis, however, holding that "willfulness . . . is not the inquiry when the infringement is permitted by a court-ordered stay."  Id. at 1362.  The court of appeals also rejected the defendant's argument that the royalty rate set for the period of the stay should be the same royalty rate that the jury found for past damages.  Id. at 1361-62.  Citing Judge Rader's concurrence in Paice, the court stated that "[t]here is a fundamental difference . . . between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement."  Id. at 1361.  The court noted that once a judgment of patent validity and infringement has been entered against a defendant, the nature of the hypothetical negotiation between the parties is different because much of the uncertainty regarding infringement and patent validity has been resolved.  See id. at 1362.

3

Amado was an unusual case, as it involved an injunction that was issued but was stayed pending appeal.  However, in ActiveVideo Networks, Inc. v. Verizon Communications, Inc., 694 F.3d 1312 (Fed. Cir. 2012), the court of appeals applied the principles discussed in Amado in a more conventional setting.   In that case, the court ruled that Amado's holding "that an assessment of prospective damages for ongoing infringement should take into account the change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability. . . . applies with equal force in the ongoing royalty context."  Id. at 1343 (internal quotation marks omitted).  The ActiveVideo court, however, did not offer guidance as to the factors a district court should consider when setting an ongoing royalty or the factors that should lead a district court to depart from the ongoing royalty set by a jury for past damages.

Courts in the Eastern District of Texas have applied the Paice approach to setting ongoing royalty rates in several patent cases.  They have consistently looked to the jury's verdict as the "starting point" for determining postjudgment damages.  See, e.g., VirnetX Inc. v. Apple Inc., No. 6:13-cv-211, slip op. at 5 (E.D. Tex. Feb. 25, 2014), ECF No. 53; Internet Machs. LLC v. Alienware Corp., No. 6:10-cv-23, 2013 WL 4056282, at *19 (June 19, 2013); Mondis Tech. Ltd. v. Chimei InnoLux Corp., 822 F. Supp. 2d 639, 645-46 (E.D. Tex. 2011); Affinity Labs of Texas, LLC v. BMW N. Am., 783 F. Supp. 2d 891, 900 (E.D. Tex. 2011).  They have then addressed how the changed circumstances would affect the royalty rate selected for purposes of calculating future damages.  In so doing, the courts have often used the so-called Georgia-Pacific factors in assessing how the changed circumstances would produce a royalty rate in a hypothetical post-verdict licensing negotiation that was different from the royalty rate the jury

4

selected based on a hypothetical licensing negotiation at the outset of infringement.[2]  See, e.g.,

VirnetX Inc., slip op. at 5-9 (considering changed circumstances with respect to plaintiff's

increased commercial success and defendant's noninfringing alternatives); Internet Machs., 2013

WL 4056282, at *19-20 (considering new evidence of a shareholder letter dated 13 days after

trial that the plaintiff argued was probative of the value of the patented invention); Mondis Tech.

Ltd., 822 F. Supp. 2d at 647 ("[T]he Court focuses on any new evidence that was not before the

jury and additionally any changed circumstances . . . between a hypothetical negotiation that

occurred in 2005 (which the jury determined) and a hypothetical negotiation that would occur in

2011 after the judgment . . . .").  In addition, courts in this district typically consider whether

continued infringement would be willful and thereby call for enhanced damages.  See, e.g.,

Internet Machs., 2013 WL 4056282, at *19; Mondis, 822 F. Supp. 2d at 646.

Based on the Paice decision and the cases that have followed it, Dr. Bianco argues that he

is entitled to an ongoing royalty of 6% of net sales on the three products in dispute.  He contends

that the proper way to calculate the ongoing royalty under the Paice precedents is to begin with

the jury's royalty rate for past damages as a floor and then to determine how much of an increase

in that level would result from a hypothetical negotiation taking place after the jury's verdict.

The increase in the royalty rate directed by the Paice line of cases, he argues, is based on the fact

that the jury's verdict has eliminated much of the uncertainty about the likelihood of liability that

would have accompanied a pre-verdict negotiation.  Moreover, he argues that an increase in the

royalty rate is justified by analogy to patent cases, in which post-verdict infringement is regarded

---

[2]  The "Georgia-Pacific factors," taken from the decision in Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), are the factors frequently considered in determining the royalty rate that would likely have been agreed upon at the conclusion of a hypothetical negotiation between the parties.

as willful and thus subjects the defendant to enhanced damages for willfulness based on the defendant's continuing acts of infringement.

## II

Globus argues that because this case is a trade secret case and not a patent case, the Paice decision and its progeny do not apply, either directly or by analogy.  Globus further contends that Dr. Bianco is not entitled to any future damages because the amount the jury has awarded him is more than sufficient to compensate him for the misappropriation, if any, of his trade secrets.  The Court will first address Globus's argument that Dr. Bianco is not entitled to any further damages at all and will then turn to the question whether, and in what way, the Paice analysis applies to this case and what royalty rate should be adopted for post-trial sales of the disputed products.

## A

The jury's finding that a reasonable royalty rate is the proper method of measuring Dr. Bianco's damages provides the starting point for the Court's determination of how future damages should be calculated.  Absent a showing to the contrary, the clear implication of the jury's verdict is that the royalty rate the jury selected for the entire period up to trial would continue into the period following trial.

Globus argues that the jury's assessment of a 5% royalty rate for past sales of the accused products should not apply to future sales.  Its principal argument is that the evidence at trial and at the post-trial hearing showed that Globus's misappropriation of Dr. Bianco's trade secrets at most gave Globus a "head start" in its effort to produce an adjustable intervertebral spacer.  However, according to Globus, any such "head start" did not last into the period after the trial.  Therefore, Globus contends, because the effects of the trade secret misappropriation had

dissipated by the time of the trial, the Court should not assess any damages for the post-verdict period.

Because the award of an ongoing royalty is a form of equitable relief, Texas case law pertaining to injunctive relief in trade secret cases is relevant to the issue of future damages in this case. Under Texas law, a court may impose perpetual injunctive relief that continues even past the time when a trade secret is publicly disclosed. See Hyde Corp. v. Huffines, 314 S.W.2d 763, 772-76 (Tex. 1958). Such perpetual relief, however, is not mandated. A court is free to award equitable relief for a limited term if the circumstances warrant such relief. See Bryan v. Kershaw, 366 F.2d 497, 499, 501-02 (5th Cir. 1966) (affirming the grant of a limited-duration injunction that was based on the amount of time "necessary to remove the competitive advantage gained through the illegally used trade secrets," id. at 499). It is Globus's burden, however, "to show by competent evidence that an order of less duration than a permanent order will afford the injured party adequate protection." Hyde, 314 S.W.2d at 776.

Additionally, the Fifth Circuit has affirmed an award of reasonably royalty damages that extended beyond the head start period gained by the defendant. In Sikes v. McGraw-Edison, 665 F.2d 731 (5th Cir. 1962), the defendant agreed to a two-year period of confidentiality and the defendant's own product was two years away from being finalized when the plaintiff disclosed his idea. Id. at 732-33. The court affirmed an award of reasonable royalty damages extending beyond two years, however. The court reasoned that if the parties had agreed to a royalty, it was "exceedingly unlikely that any such per-unit royalty . . . would have been so arranged as to terminate after two years or have been payable for any term other than the life of" the offending products. Id. at 737. Therefore, it is appropriate under Texas law for the court to consider a

reasonably ongoing royalty "by reference to the most likely period for which it would have been paid," id., had Dr. Bianco and Globus come to an agreement when Dr. Bianco first disclosed his ideas to Globus at the end of June 2007 or at some point thereafter.

Globus's "head start" theory suffers from several flaws.  First, at trial Globus did not present evidence regarding that theory.  Nor did it ask for a jury instruction embodying that theory.  Instead, Globus's principal argument at trial was that there was no misappropriation at all.  The jury, however, rejected the "no misappropriation" argument.  In the event that the jury found that Globus had misappropriated Dr. Bianco's trade secrets, Globus argued that the remedy should be in the form of a royalty for past damages up to the date of trial, but only in the amount of 0.5% of Globus's net sales of the three products at issue.  Globus did not offer evidence or argue that the damages, whether in the form of a royalty or otherwise, should have been terminated at some earlier point because any advantage Globus obtained from the misappropriation of Dr. Bianco's trade secrets had ended by the time of trial.  Thus, Globus did not present at trial the argument that all it obtained from the misappropriation, if anything, was a "head start" in developing the Caliber and Rise line of products.

In particular, the "head start" theory was not set forth in any of Globus's experts' reports, even with respect to the issue of post-trial damages.  To the contrary, at trial Globus's damages expert testified that if Dr. Bianco was entitled to damages, it should be in the form of a royalty.  Although he argued that the royalty rate should be much lower than the rate awarded by the jury, at no point did he suggest that the royalty payment should terminate because any "head start" gained by Globus would have come to an end at some point.

Globus cannot claim that it has been unfairly deprived of an opportunity to put forward a "head start" theory despite its failure to present that theory to the jury.  That might have been the case, for example, if Globus had withheld its head-start theory from the jury because the facts only supported a head-start advantage that ceased to exist on or after the date of trial and Globus had no reason to present a defense against future damages at trial.  Globus, however, was prepared to try future damages to the jury.  The only reason future damages was not tried to the jury was because the Court determined shortly before trial that Dr. Bianco's damages expert had used an unreliable method for calculating the total amount of Dr. Bianco's future damages.  Because Globus was prepared to try future damages as part of its case and never pursued a head-start theory to limit damages—at trial or in its expert reports—it is appropriate for the Court to consider Globus's failure to pursue that theory in determining the ongoing royalty rate.

Globus sought to make up for the absence of evidence as to the "head start" issue through evidence offered at the hearing on future damages, but its effort in that regard was unavailing.  The evidence Globus introduced at the hearing consisted largely of testimony from the engineers who were principally responsible for designing the Caliber and Rise line of products for Globus.  They testified, as they had at trial, that they developed those products independently, without any direct or indirect influence from Dr. Bianco's trade secrets (as embodied in the drawings he gave to Globus in June 2007).  At the hearing, the engineers added that even if they had been exposed to Dr. Bianco's drawings, the drawings would not have had any effect on the progress of their development of those products.

The problem with that evidence is that it is at odds with the jury's verdict.  The jury found that Globus misappropriated Dr. Bianco's trade secrets and that Globus's use of those

trade secrets entitled him to an award of a 5% royalty on the net sales of those products.  Under the principles of <u>Beacon Theatres, Inc. v. Westover</u>, 359 U.S. 500 (1959), and <u>Dairy Queen, Inc. v. Wood</u>, 369 U.S. 469 (1962), those findings are binding on this Court as a starting point in making the equitable determination of what ongoing royalty rate should be adopted in lieu of an injunction.  Indeed many of Globus's arguments are, in effect, challenges to the jury's finding of trade secret misappropriation and its choice of a royalty rate.  Those arguments are proper subjects for a motion for judgment as a matter of law, but they are not appropriate in a proceeding directed at setting an ongoing royalty rate, in which the Court is bound by the jury's verdict.

Significantly, the report and testimony of Globus's damages expert, Keith R. Ugone, was inconsistent with the "head start" theory that Globus raised in the course of the ongoing royalty proceedings.  Dr. Ugone stated in his report, and acknowledged on cross-examination at the evidentiary hearing, that the proper approach to calculating an ongoing royalty for trade secret misappropriation would be to continue the rate found applicable in measuring past damages.

He stated that "the royalty rate, if any, decided by the trier of fact at trial would also be the ongoing royalty rate for claimed future damages."  (Dkt. No. 296, at 115, 117).  To be sure, he proposed a much lower rate for past damages than the jury awarded.  But as to the relationship between the rate for past damages and the rate for future damages, his testimony was that they should be the same.  That evidence further underscores the point that Globus committed itself to a royalty-based theory of damages at trial.  Its effort to raise a "head start" theory during the ongoing royalty proceedings thus was not supported by its own evidence at either trial or at the post-trial evidentiary hearing.

By separate motion (Dkt. No. 289), Dr. Bianco challenged portions of the evidentiary hearing testimony of one of the Globus engineers, Chad Glerum, on the ground that it constituted opinion testimony that was barred by a pretrial stipulation entered into by the parties.  The Court granted the motion to exclude opinion testimony from Mr. Glerum at the evidentiary hearing, subject to the issue being re-raised in the briefs.  The Court then allowed Globus to offer the challenged testimony as a proffer.  The Court now reaffirms its decision that Mr. Glerum's opinion testimony is barred by the stipulation.

At the evidentiary hearing, the parties disputed the meaning of the stipulation, in which the parties agreed that Globus "will not offer opinions" from seven identified "non-retained experts . . . outside of what the witnesses testified to in their depositions."  (Dkt. No. 138).  The Court concluded at the time of the hearing, and reaffirms now, that the stipulation barred Mr. Glerum from giving any opinion testimony other than testimony that he gave in his deposition. Accordingly, the Court has excluded Mr. Glerum's testimony that prior knowledge of Dr. Bianco's trade secrets would not have assisted him in designing the Caliber devices.  Even if that testimony had been admitted, however, it would not have changed the Court's judgment on this issue for the reasons set forth above.

Mark Weiman, a Globus engineer who was principally responsible for the Rise project, testified to the same effect as Mr. Glerum with regard to the Rise device.  His testimony was not subject to the stipulation and therefore was not excludable on that ground.  Dr. Bianco argues that Mr. Weiman's testimony should have been precluded because it is expert testimony, and that Globus did not give Dr. Bianco advance notice of that testimony under Fed. R. Civ. P. 26(a)(2)(C).  The Court concludes, however, that Mr. Weiman's testimony to which Dr. Bianco

objected at the evidentiary hearing was not excludable, because it did not constitute expert opinion testimony under Fed. R. Evid. 702, 703, or 705, and therefore was not subject to Rule 26(a)(2).  See Fed. R. Civ. P. 26(a)(2)(A).  In any event, as in the case of Mr. Glerum's testimony, Mr. Weiman's testimony did not affect the Court's decision that Globus failed to support its "head start" theory for rejecting Dr. Bianco's request for future royalty damages.  For the foregoing reasons, the Court agrees with Dr. Bianco that the evidence does not support a ruling limiting the post-verdict damages to some "head start" period enjoyed by Globus, and that instead the calculation of future damages must be conducted by determining an appropriate ongoing royalty rate, starting with the rate embodied in the jury's verdict.

B

The Fifth Circuit has noted that it is generally accepted that the proper measure of damages in cases of trade secret misappropriation is determined by reference to the analogous line of cases involving patent infringement.   Univ. Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518, 535 (5th Cir. 1974).  Nonetheless, the Court recognizes that there are differences between Texas trade secret law and patent law that require distinctions to be drawn between the method to be used in calculating an ongoing royalty in patent cases and the method to be used in trade secret cases.

First, Texas trade secret law, unlike patent law, does not provide for an award of enhanced damages based on a finding of willfulness.  Instead, in order to be entitled to an enhancement in the form of punitive damages, Texas law requires a plaintiff to prove, by clear and convincing evidence, that the defendant acted with malice, i.e., with specific intent "to cause

substantial injury [or harm] to the claimant."   See Wellogix, Inc. v. Accenture, L.L.P., 716 F.3d 867, 883 (5th Cir. 2013), quoting Bennett v. Reynolds, 315 S.W.3d 867, 872 (Tex. 2010).

The Court need not determine whether malice can take the place of willfulness when setting an ongoing royalty, because during trial the Court granted judgment as a matter of law in favor of Globus on the issue of exemplary damages.   The Court concluded that Dr. Bianco did not introduce sufficient evidence to support a finding of malice. See Dkt. No. 235, at 126:10-18. Nor is there any evidentiary basis from which to conclude that Globus's post-verdict conduct would justify enhanced damages.   Dr. Bianco has not made any effort to show that Globus's conduct in continuing to market the subject products following the trial has been animated by a specific intent to harm Dr. Bianco.

A second difference between patent cases and trade secret cases that bears on the ongoing royalty analysis is that trade secret misappropriation under Texas law is not a continuing tort. Tex. Civ. Prac. & Rem. Code § 16.010(b).   Instead, the tort of misappropriation, as viewed under Texas law, occurs at the moment of misappropriation. See Gen. Universal Sys., Inc. v. HAL, Inc., 500 F.3d 444, 451-52 (5th Cir. 2007).  Thus, while a patent infringer commits a new tort of infringement each time it makes, uses or sells the patented product, a trade secret misappropriator commits only a single tort at the time of misappropriation.  For that reason, it makes more sense to view the royalty-based damages model by looking to a single hypothetical negotiation occurring at the time of the initial misappropriation, rather than, as in the Paice line of cases, determining the ongoing royalty rate based on a second hypothetical negotiation occurring immediately after the verdict.  See University Computing Co., 504 F.2d at 537, quoting Egry Register Co. v. Standard Register Co., 23 F.2d 438 (6th Cir. 1928) (reasonable

royalty is calculated by determining what the price would be for a license "granted at the time of beginning the infringement").

A single hypothetical negotiation, taking place at the time of the misappropriation, would provide the best model for determining what the parties would have agreed to as a royalty at the time of the misappropriation if the parties had reached an agreement after good faith negotiations at that time. That model also comports with the evidence at trial and at the hearing on future damages as to Globus's typical practices for negotiating royalties with surgeons and other third parties who contribute to the development of Globus products. That evidence showed that Globus's royalty agreements are typically set to last for 15 year from the date of agreement; they do not contemplate re-negotiation of the royalty rate at a future time in order for the parties to take into account changed market and economic circumstances, or changes in the relative bargaining positions of the parties to the agreement. See Sikes v. McGraw-Edison Co., 665 F.2d 731, 737 (5th Cir. 1962) (affirming reasonable royalty damages spanning a period of time that the evidence suggested the parties would have agreed to).

Although Dr. Bianco suggests that the Court should enhance the royalty rate in order to deter trade secret misappropriation in general, the Court is not persuaded that deterrence of such conduct is a valid justification for enhancement of the ongoing royalty rate. Texas trade secret law already provides adequate remedies to deter trade secret misappropriation in the first instance. A defendant who misappropriates a trade secret under Texas law not only faces the potential for liability calculated as a reasonable royalty, but also faces the risk of a judgment requiring disgorgement of up to all the profits gained as a result of that misappropriation. See Univ. Computing Co., 504 F.2d at 536. Indeed, the jury in this case was given the opportunity to

14

award Dr. Bianco disgorgement of some or all of Globus's profits resulting from its misappropriation of Dr. Bianco's trade secrets, but it declined to do so.

III

In seeking to determine the proper rate for ongoing royalties, the Court begins its inquiry with the jury's verdict.  The verdict of $4,295,760 in past damages represents a royalty rate of 5% of the past net sales of the Caliber, Caliber-L, and Rise products.

The evidence at trial showed that a royalty arrangement was exactly what Dr. Bianco hoped to obtain in exchange for disclosing his ideas to Globus in 2007.  There was no evidence that either party contemplated that Globus would be forced to re-negotiate any license granted by Dr. Bianco in order to continue selling its Caliber and Rise products.

The jury found that the most equitable result in this case was to award Dr. Bianco exactly what he expected in the first place—a reasonably royalty, and not disgorgement of Globus's profits.  While the jury's selection of a 5% royalty rate on net sales is near the high end of the royalty rates Globus has historically negotiated for use of an idea, it is within the range of those royalty rates.  Put simply, the jury found that the proper measure of damages was what Dr. Bianco lost as a result of Globus's misappropriation of his trade secrets.  The jury accordingly awarded Dr. Bianco a reasonable royalty that put him in the position he would have been in had Globus negotiated a licensing agreement with him, as Dr. Bianco originally wanted.     Based on the evidence at trial and the royalty structure that Globus has employed in the past, the Court finds that there is no reason to award a royalty rate for post-verdict sales of the disputed products that is different from the royalty rate used by the jury in determining past damages.

15

The Court recognizes that in patent cases, the Federal Circuit has directed courts considering an award of ongoing royalties to "take into account the change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability."  ActiveVideo, 694 F.3d at 1343 (internal quotation marks omitted). Accordingly, in the event that the Federal Circuit regards that principle as extending to trade secret cases such as this one, the Court will undertake an analysis of whether the parties' bargaining positions have changed and how those changes might affect a post-verdict hypothetical negotiation directed to setting an ongoing royalty rate for the future sales of the products at issue.

Pursuant to the line of cases applying Paice and its progeny, the Court will use the 5% royalty rate found by the jury as the starting point.  The Court will then analyze the specific circumstances of this case to determine whether that royalty rate should be modified.   Although individual considerations may weigh in favor of decreasing the ongoing royalty rate relative to that awarded by the jury, the Court notes that pursuant to Amado the ultimate ongoing royalty rate should not be lower than the rate awarded by the jury for pre-verdict damages.  See Amado, 517 F.3d at 1362 n.2.

A primary difference between a hypothetical post-verdict negotiation between Dr. Bianco and Globus and a hypothetical negotiation in July 2007 after Globus received Dr. Bianco's drawings, is that the verdict eliminated most of the legal uncertainty about whether Dr. Bianco's idea constituted a trade secret along with most of the legal uncertainty about whether Globus used that idea by pursuing the development and commercial sale of the Caliber and Rise products.  Although the resolution of those uncertainties might suggest that Dr. Bianco would

16

have obtained a higher royalty rate in a post-verdict hypothetical negotiation compared to what he would have obtained prior to the verdict, the Court finds that no such increase is warranted in this case given the evidence and argument presented at trial.

Neither party presented evidence or offered argument that would have allowed the jury to determine how the parties in a hypothetical negotiation would have initially discounted the value of Dr. Bianco's ideas based on legal uncertainty over whether those ideas were entitled to trade-secret status or whether commercialization of the Caliber and Rise line of products would amount to use of Dr. Bianco's ideas. Instead, the parties focused on the significance of Dr. Bianco's ideas relative to the products that Globus ultimately developed. They presented evidence and argument about how Dr. Bianco's contribution to the development of those products compared to the contributions of other surgeons or companies with whom Globus entered into consulting or licensing agreements with royalty rates ranging from 0.5% to 6% of net sales. The jury was instructed that in setting a reasonable royalty it could consider "any other factors that might affect the rate that the parties would choose," Final Jury Instructions, Dkt. No. 226, at 7. However, the jury was not explicitly instructed to assume that the parties in the hypothetical negotiation would have assumed that Dr. Bianco's idea was a trade secret that Globus would use in the legal sense if it pursued the development and commercial sale of the Caliber and Rise products. Under these circumstances, the Court concludes that it is highly unlikely that the jury discounted its royalty determination based on legal uncertainties, without evidence or argument about how the hypothetical negotiation would have been affected by such uncertainties.

To the extent that the resolution of legal uncertainties might bear on the amount of the ongoing royalty, some of the uncertainties have been resolved in Globus's favor.  Thus, prior to trial, Globus faced the risk of disgorgement of some or all of its profits and the risk of a permanent injunction if it proceeded to build the Caliber and Rise line of products without an agreement with Dr. Bianco.  The jury, however, determined that disgorgement was not the appropriate remedy, and the Court ruled that Dr. Bianco was not entitled to exemplary damages and that a permanent injunction against the sale of the disputed Globus devices was not warranted (Dkt. No. 269).  Those circumstances offset the potential improvement in Dr. Bianco's post-verdict negotiating position attributable to the portion of the jury's verdict that was in his favor.  That is, the jury's verdict resolved some of the legal uncertainties in a way that strengthened Dr. Bianco's negotiating position from what it would have been in July 2007 (such as the risk that Dr. Bianco's idea would not be found to constitute a trade secret or would not be found to have been be used in the Caliber and Rise devices).  The verdict, however, resolved other uncertainties in a way that strengthened Globus's negotiating position (such as the elimination of the risk of an order of disgorgement of profits, an award of exemplary damages, an injunction, and a judgment declaring Dr. Bianco to be a co-inventor on several of Globus's patents).  The Court finds that with respect to the issue of the effect of the legal uncertainty that existed in 2007 on the royalty rate, the changed legal positions of the parties post-verdict roughly offset each other.

The Georgia-Pacific factors also do not support a royalty rate in excess of 5% for the invention.  The Georgia-Pacific factors that the Court regards as pertinent to this case are: (1) royalty rates paid by the defendant or others in the industry for similar inventions (here, trade

secrets) under similar circumstances; (2) the profitability of the products; (3) the extent to which the products use or embody the invention or trade secret; and (4) the extent to which the profitability of the products is attributable to the invention or trade secret.

One of those factors, the profitability of the products, may cut in favor of an enhanced royalty rate, as the evidence shows that the Caliber and Rise products have been highly profitable. Other factors, however, suggest an ongoing royalty rate at the lower end of the 5% to 6% range. First, on only one other occasion has Globus paid a royalty rate in excess of 5%, and on that occasion, Globus points out, the payment was for more than an idea: it was for a product that had already been patented and prototyped. Second, while the products in dispute in this case embody the general idea of Dr. Bianco's trade secrets, the designs of those products differ in significant ways from the design depicted in the drawings that Dr. Bianco provided to Globus. Third, and relatedly, as to the extent to which the profitability of the products is attributable to Dr. Bianco's contribution, the evidence shows that the engineering of the products, including the use of a ramp-based expansion mechanism, involved substantial departures from the mechanisms depicted in the relatively crude drawings supplied by Dr. Bianco, which included a scissor-jack expansion mechanism. In particular, the combination of features that made it possible for the Caliber and Rise products to be both small and robust were contributed by Globus's engineers, and were not part of any specific suggestions contributed by Dr. Bianco. That factor cuts against selecting a royalty rate at the high end of the range under consideration. Weighing those factors together, the Court concludes that a rate at the lower end of the range between 5% and 6% is the appropriate ongoing royalty rate in this case.

A further component of the ongoing royalty award is the length of time for which royalty payments will be due.  The evidence at trial showed that Globus's consulting and licensing agreements with physicians and others for product ideas and suggestions typically have a maximum term of 15 years.  Dr. Bianco's damages expert, Stephen L. Becker, testified at the post-trial evidentiary hearing that, consistent with other royalty agreements entered into by Globus, the length of the period of ongoing royalties for Dr. Bianco should be 15 years.  In his brief on the ongoing royalties issue, Dr. Bianco stated that he "does not make any claim to royalties accruing beyond that [15-year] period." (Dkt. No. 301, at 11 n.4).

Based on Dr. Becker's testimony, the other licensing agreements entered into by Globus, and Dr. Bianco's concession limiting his claim, the Court adopts 15 years as the maximum period for which Globus will be required to pay royalties to Dr. Bianco.  Although Dr. Becker took the position that the 15-year period should run from the date of the post-verdict hypothetical negotiation, the Court has rejected Globus's argument that the ongoing royalty rate should be determined by reference to a second hypothetical negotiation.  Accordingly, the Court considers the proper model for the beginning of the 15-year period to be the consulting agreements entered into by Globus with surgeons, a number of which are in the record.  In those agreements, which typically run for 15 years, the 15-year period begins when the agreement is executed, not when the products begin to be sold.  Since the agreements are designed to obtain input from the physicians as to the design of the devices in question, they are typically entered well before the instrument or device at issue is produced or sold.  Applying the same principle to the hypothetical agreement with Dr. Bianco suggests that the 15-year period for which Globus is liable for royalty payments to Dr. Bianco should run from July 1, 2007, immediately after Dr.

Bianco provided his drawings to Globus, not the date of the verdict in or the judgment in this case.[3]

The evidence at trial provides further support for that conclusion. Dr. Bianco testified that when he gave his drawings to Globus he expected to enter into a compensation agreement if Globus decided to produce an adjustable intervertebral spacer based on his design. The evidence shows that shortly thereafter Globus began exploring the possibility of making an adjustable intervertebral spacer, although the actual engineering work on the Caliber device did not begin until early 2009. Under these circumstances, it was reasonable for Dr. Bianco to expect—and the evidence at trial shows that he did expect—that Globus would act fairly promptly on his suggestion and reach an agreement with him on compensation. For those reasons, the Court holds that July 1, 2007, is the appropriate starting date for the 15-year royalty period.

As a further component of the ongoing royalty award, Dr. Bianco requests that the Court's order regarding royalty payments be made applicable not only to the Caliber, Caliber-L,

---

[3] Prior to trial, Globus successfully moved to exclude Dr. Becker's testimony about future damages because Dr. Becker sought to quantify the future damages by estimating future sales of the accused products and extending that projection over a period of 15 years. Globus now objects to Dr. Becker's testimony at the evidentiary hearing about the 15-year period for the license on the ground that Dr. Bianco is attempting to use that period in order to obtain "damages in the form of a lump sum projected to compensate for sales 15 years from the date [of] a hypothetical re-negotiation." (Dkt. No. 302, at 10). At this point, however, Dr. Bianco is no longer requesting a lump sum award as future damages, but instead is seeking an ongoing royalty. Therefore, evidence that such a royalty award should last a maximum of 15 years is not objectionable, because it was not based on an unreliable projection of future sales of the accused products. As for Globus's argument that striking the evidence regarding the 15-year period would "leave[] Dr. Becker with no opinion as to a time frame for future damages," that argument again misses the point. Dr. Becker's evidence introduced at the evidentiary hearing was directed to establishing a royalty rate on the ongoing sales of the Caliber and Rise products. Because Dr. Bianco's proof at the evidentiary hearing was directed only at the appropriate royalty rate to be used with regard to future sales, there was no need for him to establish a fixed "time frame" for the award of damages.

and Rise products, but also to products not colorably different from those products.  Globus disagrees and contends that there is no justification for including such a provision in the Court's judgment.

An order basing ongoing royalty payments on future sales of those three products implicitly extends to any products that are not colorably different from those products.  See Soverain Software LLC v. Newegg Inc., 836 F. Supp. 2d 462, 484 (E. D. Tex. 2010); Creative Internet Adver. Corp. v. Yahoo! Inc., 674 F. Supp. 2d 847, 853-55 (E.D. Tex. 2009).  Globus cannot avoid its royalty obligations simply by renaming its products or making some trivial and immaterial change in the products.  In order to avoid any possible misunderstanding of the scope of the judgment in that respect, the Court will make it explicit that the royalty obligation applies to products that are not colorably different from the Caliber, Caliber-L, and Rise products that were the subjects of the jury's finding of misappropriation.

Dr. Bianco further requests that the ongoing royalty payments be made on a quarterly basis with a right to periodic accounting of the royalty-bearing sales.  Globus has not responded to that request, and as the Court regards the request as reasonable, it will be made part of the Court's judgment when the final judgment is entered.

In conclusion, the Court finds that Dr. Bianco is entitled to an ongoing royalty rate equal to that determined by the jury for past damages.  In the final judgment, to be entered separately, the Court will therefore order that Globus pay Dr. Bianco 5% of the future "net sales" (as defined in the exemplary Globus royalty agreements considered by the damages experts in this case) of Globus's Caliber, Caliber-L, and Rise products, or products not colorably different from those products, with the royalty payment period terminating 15 years after July 1, 2007.

III

Before entering final judgment in this case, the Court must determine whether Dr. Bianco should be awarded prejudgment interest and the amount of costs that should be taxed under Fed. R. Civ. P. 54(d) and 28 U.S.C. § 1920.  Accordingly, the Court orders the parties to file a joint notice setting out their positions as to (1) whether the judgment should contain an award of prejudgment interest; (2) if so, how prejudgment interest should be calculated and what the amount of the prejudgment interest award should be; (3) the amount of taxable costs; (4) how those costs should be allocated, given that neither party prevailed on all of the issues in this case; and (5) the definition of "net sales" that the Court should incorporate in the ongoing royalties portion of the judgment.  The parties' joint notice should contain legal analysis explaining their respective positions, but should be no more than 15 pages in length.  The joint notice shall be filed on or before July 15, 2014.

IT IS SO ORDERED.

SIGNED this 1st day of July, 2014.

WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE