IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| SABATINO BIANCO, M.D., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 2:12-CV-00147-WCB |
| | § | |
| GLOBUS MEDICAL, INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

### I.  Background

Globus Medical, Inc., the defendant in this case, manufactures and sells medical devices, including spinal implants that surgeons use to perform spinal fusion surgery.  Spinal fusion is a type of surgery that is often performed on patients with degenerative disc disease, which causes the space between two adjacent vertebrae in the spine to become compressed.  In patients with that condition, the relatively soft disc material between the bony vertebrae of the spine can bulge out or rupture, pinching the nerves that extend from the spinal column and causing significant pain.  The goal of spinal fusion surgery is to remove the compressed disc material, restore the distance between the two vertebrae, and cause new bone material to grow between the vertebrae so that they ultimately form one fused vertebral bone.  To accomplish that goal, surgeons remove the compromised disc material and place small implants, sometimes referred to as "spacers" or "interbody spacers," between the two adjacent vertebrae where the removed disc material used to

be.  The spacers remain in the patient's body to maintain the separation between the two adjacent

vertebrae while the new bone grows and ultimately fuses the two vertebrae together.

Prior to the commercialization of the Globus products at issue in this case, most of the

spinal implants available for fusion surgeries were of fixed sizes.  A surgeon using that type of

implant would have to select the appropriate size for a particular patient and then force the spacer

into the space between the adjacent vertebrae.  That procedure required the surgeon to apply

considerable force to "wedge" or "hammer" the spacer between two adjacent vertebrae in order

to obtain the desired separation.  One type of spacer that predated the Globus products (the Spine

Wave StaXx XD) was expandable, but it was only expandable in discrete increments and could

not be reduced in height once it was expanded.

The products at issue in this case are three devices produced by Globus that are implanted

in patients during fusion surgery: Globus's Caliber, Caliber-L, and Rise products (collectively,

the "Caliber and Rise products").  The Caliber and Rise products are continuously adjustable and

reversible interbody spacers.  Because they are continuously adjustable, a surgeon can insert the

spacer between two vertebrae while the spacer is at its minimum height and then expand the

spacer to the precise height required for a particular patient when the spacer is in the appropriate

position.  Likewise, the surgeon can alter the initial positioning of the spacer during surgery by

simply reducing the height of the spacer, moving it to a new position, and re-extending it to the

required height.  As a result, the patient is subject to less trauma during surgery than with a

nonadjustable (or nonreversible) spacer, and successful fusion is more likely in view of the

customized fit of the implant.  The Caliber and Rise line of products have been a commercial

success for Globus.  In addition, Globus has obtained patents that cover adjustable interbody spacers similar in design to the Caliber, Caliber-L, and Rise products.

The plaintiff in this case, Dr. Sabatino Bianco, filed this suit against Globus alleging, among other claims, that by developing and commercializing the Caliber and Rise products, Globus misappropriated trade secrets he had disclosed in confidence to Globus.  The case was tried to a jury between January 13 and January 17, 2014.  At the conclusion of the trial, the jury returned a verdict finding Globus liable for trade secret misappropriation, but not liable for breach of contract.  The jury awarded Dr. Bianco $4,295,760 in damages for past trade secret misappropriation, which was five percent of the profits that Globus earned on the products up to the original trial date, as calculated by Globus's expert.[1]

After trial, the Court denied Dr. Bianco's request for a permanent injunction.  However, following the procedure approved by the Federal Circuit in <u>Paice v. Toyota Motor Corp.</u>, 504 F.3d 1293, 1313-16 (Fed. Cir. 2007), the Court granted Dr. Bianco's request that the Court consider directing Globus to pay an ongoing royalty on the Caliber, Caliber-L, and Rise products in lieu of an injunction.  Dkt. No. 269.  The Court held an evidentiary hearing on the ongoing royalty issue and ultimately awarded Dr. Bianco a royalty of five percent of net sales—consistent with the rate awarded by the jury for past damages—on future sales of the Caliber, Caliber-L, and Rise products for a maximum period of 15 years from July 1, 2007.  Dkt. No. 311.  The Court entered final judgment in the case on July 17, 2014.  Dkt. No. 315.

---

[1]  The two damages experts expressed their conclusions regarding damages in terms of what Globus referred to as "net sales."  The net sales of a product is Globus's way of calculating profits on the product.  Globus used net sales to calculate royalty payments that it made to surgeons who were members of its product design teams.  As used here, the term "profits" will refer to net sales, as determined by Globus in calculating royalty payments.

Globus now moves for judgment as a matter of law on the issue of trade secret misappropriation under Federal Rule of Civil Procedure 50(b).   Globus asserts that Dr. Bianco's evidence was insufficient to establish trade secret misappropriation.  In support of that assertion, Globus makes three arguments.  First, Globus asserts that the ideas depicted in the drawings that Dr. Bianco provided to Globus were not trade secrets.  Second, even if Dr. Bianco's ideas for an adjustable interbody spacer constituted trade secrets, Globus denies that it acquired those trade secrets through improper means or through the breach of a confidential relationship.  Finally, Globus asserts that even if Dr. Bianco's ideas constituted trade secrets and Globus obtained them improperly, the evidence was insufficient to prove that Globus made any use of those trade secrets, as required to support a claim of trade secret misappropriation.

Globus has also challenged the damages award, arguing that the Court should reduce the amount of the jury's award of past damages or order a new trial on the issue of damages.  On the issue of past damages, Globus argues that the evidence does not support the royalty rate used by the jury and that the jury should have apportioned the royalty base according to Dr. Bianco's contributions to the Caliber and Rise products, rather than using as the royalty base the profits made on the Caliber and Rise line of products as a whole.  In addition, Globus has moved to amend the judgment to omit the award of future royalties to Dr. Bianco on the ground that Texas trade secret law does not permit the award of future royalties in a case such as this one.

## II.  The Evidence

### A.  Dr. Bianco's Ideas as Trade Secrets

Dr. Bianco testified at trial that the concept of an adjustable interbody spacer with certain features that could be used in fusion surgeries was his idea.  He claimed that he submitted that

idea to Globus in confidence before Globus initiated its efforts to develop the Caliber and Rise line of products.  According to Dr. Bianco, that idea and its components constituted trade secrets, which Globus misappropriated by developing and commercializing the Caliber and Rise line of adjustable interbody spacers for fusion surgeries.

The evidence at trial, viewed most favorably to Dr. Bianco, showed that in early 2007, Globus invited Dr. Bianco to its headquarters in the Philadelphia area for a "VIP trip" to meet Globus's executives and learn about the company's new ideas.  During that visit, Dr. Bianco told Globus representatives that he had some new ideas for implants for spinal surgery that he wanted Globus to consider.  1/13/14 PM Tr. 70-71.  At that time, Globus sold a non-movable interbody spacer, but it did not sell an expandable interbody spacer product.  Id. at 73.  At the meeting, Globus representatives explained to Dr. Bianco the protocol for physicians to submit new ideas to the company.  Id. at 75.  Globus had him sign a non-disclosure agreement that prohibited him from disclosing any of Globus's ideas and prohibited Globus from disclosing any of his ideas without his input.  Id. at 71-72.

Dr. Bianco testified that after the VIP meeting, he told Globus area director (and later regional vice-president) Gregg Harris about an idea he had for a new product.  Harris responded that if Dr. Bianco had drawings of his new idea, he should have them notarized to protect both Dr. Bianco and Globus, "so we make sure we don't have problems afterwards."  1/13/14 PM Tr. 75, 85.  Another Globus representative made a similar request by email that Dr. Bianco notarize his drawings.  Id. at 85.  After notarizing the drawings that depicted his ideas, Dr. Bianco met with Mr. Harris to explain his ideas and give him the drawings.  Id. at 75-78.

The set of drawings that Dr. Bianco gave to Globus was entitled "Adjustable Interbody Spacer."  1/13/14 PM Tr. 78.  The drawings depicted a spacer element connected to a long shaft with a dial on the end of the shaft opposite the spacer element.  Along with a few other features, the drawings depicted the spacer element with a "scissor-jack" mechanism for increasing or decreasing the height of the spacer in the range of 6 to 14 millimeters.  PX33; 1/13/14 PM Tr. 78-81.  A scissor jack is a mechanism frequently used in automobile jacks.  In its simplest form, a scissor jack consists of two metal arms that are rotatably attached at the centerpoint of each, as in a  pair of scissors.  As the arms move from a horizontal to a vertical position (as in the case of an upright pair of scissors that is moved from a fully open to a fully closed position), the rotation of the arms will cause an increase in the distance between two plates that are attached to the ends of the arms.

Dr. Bianco contends that his trade secrets are not limited to the particular scissor-jack design of the adjustable interbody spacer depicted in his drawings.  Instead, he contends that his trade secrets included the general idea for a continuously expandable, reversible spacer for fusion surgeries that could be inserted between two vertebrae at a minimum height and then expanded to the precise height required for the particular patient.

Dr. Bianco testified that he met with Mr. Harris of Globus for at least an hour to discuss his idea for the adjustable interbody spacer.  He gave Mr. Harris his drawings at that time. 1/13/14 PM Tr. 85-86.  According to Dr. Bianco, Mr. Harris said he would present the drawings to a committee at Globus known as the "new products committee," which met monthly, and that a decision regarding the new idea would take two to four months.  Mr. Harris added that as soon as the committee made a decision, he would let Dr. Bianco know, and that if the company

decided to use his idea, Dr. Bianco would be compensated in an amount that would be "standard for a doctor presenting a new idea." Id. at 86, 89, 255.  Mr. Harris asked Dr. Bianco to fill out a Globus "new idea submission form" to submit his proposal.  A few days later, another Globus representative sent Dr. Bianco an email confirming that Mr. Harris had conveyed Dr. Bianco's "New Idea Submission Forms" and adding that "Globus Product Development engineers will review the ideas and sketches."  PX33.

Dr. Bianco testified that before his meeting with Mr. Harris, he took steps to ensure the secrecy of his ideas and thereby preserve their status as trade secrets.  In particular, he testified that before meeting with Mr. Harris he kept his drawings in a safe in his office.  1/13/14 PM Tr. 84.

Over the next two and a half years, Dr. Bianco asked Mr. Harris on multiple occasions about whether Globus had made a decision regarding the development of his idea.  1/13/14 PM Tr. 89-90.  Each time, Mr. Harris told him that it was a complex project, that the company had to consider resources and potential return on investment, and that the company needed more time before letting Dr. Bianco know whether it was interested in his proposal.  Id. at 90.

In the fall or winter of 2009-2010, according to Dr. Bianco, Mr. Harris returned Dr. Bianco's drawings to him.  Mr. Harris told Dr. Bianco at that time that Globus was "not interested in this technology."  1/13/14 PM Tr. 89-90, 93-95; 1/14/14 AM Tr. 98-99.  Although Dr. Bianco visited Globus's headquarters on several occasions between 2007 and 2010, and had provided input to Globus on other types of medical implants during that period, Globus did not advise Dr. Bianco that it was working on the Caliber and Rise line of products or that it had filed a patent application for an adjustable interbody spacer.  Id. at 95-96.

In early 2011, Globus began marketing its Caliber product.  Dr. Bianco learned about the Caliber device for the first time when a Globus representative showed him a sample of the Caliber spacer and tried to sell it to him.  1/13/14 PM Tr. 103.  When he saw the Caliber spacer, Dr. Bianco was upset, as he believed the Caliber device embodied the basic concept and significant elements that were derived from his drawings.  Id. at 103-04; 1/14/14 AM Tr. 100. Dr. Bianco confronted Mr. Harris regarding the Caliber device.  1/13/14 PM Tr. 107-10.  Dr. Bianco reminded Mr. Harris that he had said the company was not interested in this technology, and he added, "I had no clue that you guys were doing this, and what's going on?"  Id. at 111. Mr. Harris responded that he was sorry and that "[h]e understood that [Dr. Bianco] had intellectual property in this implant and that the company would make it right."  Id.

**B.  Globus's Use of Dr. Bianco's Trade Secrets**

Dr. Bianco's theory of how Globus used his trade secrets is essentially that he provided the motivation for Globus to make an adjustable interbody spacer as well as the core concepts underlying the design of such a device.  In particular, Dr. Bianco asserts that he was the source of the idea to make an adjustable interbody spacer that would be continuously expandable and reversible within a range of distraction heights, that his ideas prompted Globus to pursue the detailed design and development work to bring such a product to fruition, that his design facilitated Globus's development work, and that the final products marketed by Globus contained many of the features of the trade secrets that Dr. Bianco had disclosed in confidence to Globus.

The evidence at trial showed that, shortly after receiving Dr. Bianco's drawings, Globus circulated them to several Globus executives responsible for product development and

8

fabrication.  Within a few months of receiving Dr. Bianco's drawings, Globus started its first-ever project to design and manufacture an adjustable interbody spacer.  In October 2007, Globus executive Bill Rhoda assigned engineer Ed Dwyer the task of coming up with concepts for a way to expand an implant.  1/16/14 AM Tr. 153.  The natural inference from the timing of those events, Dr. Bianco argues, is that the submission of his ideas to Globus was the motivating factor behind Globus's decision to begin that project, which ultimately led to the Caliber program that was started in early 2009.  The fact that the designs that ultimately emerged from Globus's efforts were more fully developed and were significantly different from the relatively crude drawings made by Dr. Bianco is of no import, according to Dr. Bianco, because the Caliber and Rise products still embodied his idea for an adjustable interbody spacer for use in fusion surgeries and contained many of the features depicted in his drawings.

Dr. Bianco asserted at trial that in addition to motivating Globus to pursue the development of an adjustable spacer for fusion surgeries, his drawings accelerated the product development process by indirectly providing the basic concepts of an adjustable interbody spacer to the engineers responsible for the designs of the Caliber and Rise products.  Two of the Globus senior executives who saw Dr. Bianco's drawings after he submitted them—Andy Lee and Bill Rhoda—met in 2007 to discuss what to do with Dr. Bianco's proposals.  During that meeting, Mr. Lee came up with a ramp-based concept as a potential way to implement Dr. Bianco's ideas and sketched a simple version of that concept on the back of the sheet of paper containing Dr. Bianco's drawings.  1/14/14 AM Tr. 36-57; PX37.  Globus built a prototype of Mr. Lee's ramp concept.  That prototype was later shelved, but the ramp-based expansion mechanism was ultimately used in the Caliber and Rise products.

In its simplest form, a ramp-based expansion mechanism consists of two ramps or inclined planes within the implant that can move laterally with respect to one another. Rotation of an actuator drives one of the ramps forward against the other. The forward motion of the ramp drives the top plate of the implant up and the bottom plate down, increasing the height of the implant. The height of the implant can be reduced by rotating the actuator in the opposite direction.

Chad Glerum, the engineer who ultimately designed Caliber and Caliber-L, was assigned to the Caliber project in early 2009. Mr. Rhoda discussed the Caliber project with Mr. Glerum soon after Mr. Glerum was assigned to the project. Based on Mr. Rhoda's previous discussion of Dr. Bianco's drawings with Mr. Lee, Dr. Bianco asserts that his drawings contributed to accelerating Mr. Glerum's design and development efforts on the Caliber project. Dr. Bianco traces a similar path from his drawings to the design and development efforts of Mark Weiman, the lead engineer on the Rise project.

### C. Dr. Bianco's Evidence and Theory of Damages

At trial, Dr. Bianco argued that if the jury should find that Globus had misappropriated his trade secrets, the remedy should be disgorgement of all of Globus's profits on the Caliber, Caliber-L, and Rise products. Alternatively, Dr. Bianco asked the jury to award him a royalty of between five and six percent of the profits it earned on those products, by awarding him that percentage share of the net sales of those products, as defined in various royalty agreements that Globus entered into with surgeons who worked on Globus design teams. 1/15/14 AM Tr. 46; 1/17/14 AM Tr. 202. Dr. Bianco argued that a royalty in the range of five to six percent of the

net sales of the Caliber and Rise line of products was consistent with the royalty rates that Globus paid in other settings when it purchased an entire product or product line.

The evidence showed that Globus typically assembles design teams of surgeons to test and comment on product designs that Globus is developing.  Globus ordinarily pays a royalty of one-half of one percent of the net sales of each product to each surgeon-member of those design teams, although some surgeons have received twice that amount or more.  Dr. Bianco contended that his contribution of an idea for an entirely new product was much greater than the minor contributions and feedback normally provided by the design-team surgeons and therefore warranted a much higher royalty rate.  He argued that his contributions were at least equivalent to the sum total of all of the contributions provided by the Caliber design team surgeons and that the royalty rate to which he was entitled was therefore at least on par with the sum-total of the royalty rates paid to all the surgeons on the Caliber design team, which was four percent of net sales.

## III.  Discussion

### A.  Legal Standards Applicable to Post-Trial Motions

Judgment as a matter of law under Rule 50(b) is appropriate when "there is no legally sufficient evidentiary basis for a reasonable jury" to have found as it did with respect to a particular issue.  Flowers v. S. Reg'l Physician Servs. Inc., 247 F.3d 229, 235 (5th Cir. 2001).  The Court is required to "consider all of the evidence, drawing all reasonable inferences and resolving all credibility determinations in the light most favorable to the non-moving party."  Id.

A new trial may be granted in cases in which the district court "finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or

prejudicial error was committed in its course." Smith v. Transworld Drilling Co., 773 F.2d 610, 612-13 (5th Cir. 1985).  However, "[a] motion for a new trial should not be granted unless the verdict is against the great weight of the evidence, not merely against the preponderance of the evidence." Dahlen v. Gulf Crews, Inc., 281 F.3d 487, 297 (5th Cir. 2002); see also Laxton v. Gap Inc., 333 F.3d 572, 586 (5th Cir.  2003) ("A new trial is warranted if the evidence is against the great, and not merely the greater weight of the evidence.").  In passing on a motion for a new trial, the trial court "need not take the view of the evidence most favorable to the verdict winner, but may weigh the evidence." Shows v. Jamison Bedding, Inc., 671 F.2d 927, 930 (5th Cir. 1982); see Whitehead v. Food Max of Miss., Inc., 163 F.3d 265, 270 n.2 (5th Cir. 1998).

A court will not reduce a damages award "unless the award 'clearly exceeds that amount that any reasonable man could feel the claimant is entitled to.'" Wackman v. Rubsamen, 602 F.3d 391, 404-05 (5th Cir. 2010).  "To overturn or reduce a damages award, the 'extent of distortion [must] . . . be so large as to shock the conscience, so gross or inordinately large as to be contrary to right reason, so exaggerated as to indicate[] bias, passion, prejudice, corruption, or other improper motive." Id. at 405 (alteration and omission in original).

**B.  Motion for Judgment as a Matter of Law: Trade Secret Misappropriation**

**1.  Disclosure of Trade Secrets**

Globus first argues that Dr. Bianco presented insufficient evidence at trial from which a reasonable jury could have found that Dr. Bianco disclosed a trade secret or secrets to Globus. According to Globus, Dr. Bianco defined his trade secret as a combination of distinct features identified by his technical expert, Dr. Carl McMillin.  Globus asserts that the drawings Dr. Bianco gave to Globus do not disclose the combination of all of those features, and that Dr.

12

Bianco did not offer sufficiently detailed evidence to show that he disclosed the combination of all of those features either through his drawings or through his interactions with Globus representatives.

Globus did not raise that specific argument in its pre-verdict Rule 50(a) motion for judgment as a matter of law. Globus has therefore waived the right to make that argument as part of its renewed motion for judgment as a matter of law under Rule 50(b). See Flowers v. S. Reg'l Physician Servs. Inc., 247 F.3d 229, 238 (5th Cir. 2001); Duro-Last, Inc. v. Custom Seal, Inc., 321 F.3d 1098, 1107-08 (Fed. Cir. 2003); 9B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2537 (3d ed. 2008) ("[T]he district court only can grant the Rule 50(b) motion on the grounds advanced in the pre-verdict motion, because the former is conceived as only a renewal of the latter.").

In its Rule 50(a) motion, Globus argued that Dr. Bianco's ideas did not constitute a trade secret or secrets, for three reasons. First, Globus argued that Dr. Bianco's ideas were not secret because all of the components of his ideas were already known. Second, Globus argued that a trade secret must be more than "a mere idea," and that it was not enough that his idea may have inspired Globus to use ramps as the expansion mechanism in its intervertebral spacers. Third, Globus argued that Dr. Bianco failed to show that the combination of features he claimed as his trade secret were entitled to protection, because the combination was obvious in light of the prior art Scissor Jack instrument made by Medtronic, Inc., another manufacturer of medical devices. Dkt. No. 221, at 3-6; see also 1/15/14 AM Tr. 114. Globus did not argue that Dr. Bianco failed to disclose to Globus all the components that he or his expert claimed to constitute his trade secret, which is the argument Globus has made for the first time in his post-verdict Rule 50(b)

motion.[2]   Hence, because Globus's current argument that Dr. Bianco failed to disclose all the components of his trade secret to Globus was not raised in Globus's Rule 50(a) motions, it is waived.

Even if that argument were not waived, the Court would reject it on the merits.  Globus's argument that Dr. Bianco did not offer sufficient evidence to show that he disclosed all of the features that comprised his trade secret conflates trade secret law and patent law principles.  Dr. Bianco did not limit his trade secret claim to the specific combination of those features that his expert identified as having been disclosed to Globus.  That is, by identifying at trial all the features of the idea he disclosed to Globus, Dr. Bianco was not describing "narrowing limitations" that defined his trade secrets in the same manner that such limitations define the scope of patent claims.

Trade secret law generally does not require that a trade secret be defined by way of such limitations.  See Restatement (Third) of Unfair Competition § 40 cmt. (1995) ("The unauthorized use need not extend to every aspect or feature of the trade secret; use of any substantial portion of the secret is sufficient to subject the actor to liability.  Similarly, the actor need not use the trade secret in its original form.").  The purpose of Dr. Bianco's identification of the various features of his disclosure to Globus was to show a connection between his disclosure and the

---

[2]   In its reply memorandum in support of its Rule 50(b) motion, Globus argues that it raised the argument that Dr. Bianco failed to show that he disclosed all of the elements of his trade secret or secrets to Globus.  Dkt. No. 334, at 1-2.  In support of that contention, however, Globus cites to a portion of its Rule 50(a) motion in which it contended that Dr. Bianco did not disclose a "workable device" to Globus.  Dkt. No. 221, at 9.  Besides being a different argument, that argument was made as part of Globus's contention that Dr. Bianco failed to prove that Globus used his trade secrets, not as part of an argument that Dr. Bianco did not disclose any trade secret or secrets to Globus.  Globus has failed to show that it preserved the argument it now raises.

Caliber and Rise products.  Even if the jury concluded that not all of the features identified by Dr. Bianco's expert were shown in his drawings or otherwise disclosed to Globus, it could have found the features allegedly omitted from Dr. Bianco's drawings—such as the presence of radiographic markers and the use of particular materials in construction—were ancillary to the core idea of a continuously adjustable and reversible interbody spacer for use in fusion surgeries. Thus, it was not necessary for the jury to conclude that every feature identified by Dr. Bianco's expert was disclosed in the drawings Dr. Bianco gave to Globus in order for the jury to find that Dr. Bianco conveyed the concept of an adjustable interbody spacer to Globus and that his idea for such a spacer was a trade secret.

In its post-trial brief, Globus has not argued that the idea for a continuously adjustable interbody spacer was already in the public domain and therefore could not be a trade secret.[3] Instead, Globus makes the argument that "a trade secret must be more than a mere idea."  That argument is unconvincing.

The authority cited by Globus does not establish that, as a matter of Texas law, "a trade secret must be more than a mere idea."  Globus relies on Gonzales v. Zamora, 791 S.W.2d 258 (Tex. App. 1990), in which a Texas court of appeals stated that "[w]e do not consider the statement that a trade secret may be only an idea to be a correct statement of the law."  Id. at 264. The court in Gonzales, however, was making the point that trade secret law does not create a

---

[3] Nor would such an argument succeed.  While a trade secret must be kept secret in order to be eligible for protection, and while knowledge in the trade "is an important inquiry, uniqueness in the patent law sense is not an essential element of a trade secret. . . .  As distinguished from a patent, a trade secret need not be essentially new, novel or unique." Cataphote Corp. v. Hudson, 422 F.2d 1290, 1293 (5th Cir. 1970) (quotation omitted); Ultraflo Corp. v. Pelican Tank Parts, Inc., 926 F. Supp. 2d 935, 960 (S.D. Tex. 2013) ("Novelty and uniqueness are not prerequisites for a trade secret."), citing Gonzales v. Zamora, 791 S.W.2d 258, 264 (Tex. App. 1990).

right to exclude based on a property right in the idea itself, as is the case in patent law.  Instead, trade secret law protects an idea only if the idea is kept secret, and liability flows only from improper conduct in obtaining or using that idea.  The <u>Gonzales</u> court made that point clear by its reliance on the First Restatement of Torts, which states:

> The suggestion that one has a right to exclude others from the use of his trade secret because he has a right of property in the idea has been frequently advanced and rejected.  The theory that has prevailed is that the protection is afforded only by a general duty of good faith and that the liability rests upon breach of this duty, that is, breach of contract, abuse of confidence or impropriety in the method of ascertaining the secret.  Apart from breach of contract, abuse of confidence or impropriety in the means of procurement, trade secrets may be copied as freely as devices or processes which are not secret.

<u>Restatement (First) of Torts</u> § 757 cmt. a (1939).

Neither <u>Gonzales</u> nor the Restatement stands for the proposition that a trade secret must be more than just an idea.  What those authorities stand for is that the idea that is claimed as a trade secret is not a protected property right in the abstract, but is protected only as long as it is kept secret and only against appropriation by improper means.  Thus, both <u>Gonzales</u> and the Restatement would support liability in the case of misappropriation of a "mere idea," if the idea had been kept secret and liability were premised on a breach of confidence, as it was in this case.

Globus also relies on <u>Numed, Inc. v. McNutt</u>, 724 S.W.2d 432 (Tex. App. 1987).  That case is inapposite.  <u>Numed</u> concerned claims of trade secret status for "customer lists, contract renewal dates, price lists, and marketing research" that were allegedly misappropriated by a former employee of the plaintiff.  <u>Id.</u> at 434.  The court found that the defendant had not taken or copied any of the plaintiff's information when his employment with the plaintiff was terminated and that "the skills acquired by [the former employee] . . . which he later used to market his own product, were derived from his own expertise, not the property of [the plaintiff]."  <u>Id.</u> at 435.

The court stated that a former employee does not commit trade secret misappropriation when he "use[s] the general knowledge, skills, and experience acquired during his prior employment to compete with a former employer and even do business with the former employer's customers, provided that such competition is fairly and legally conducted." Id. Numed therefore relied on a line drawn in the law to discern when former employees misappropriate their former employer's trade secrets, as opposed to merely using knowledge and experience obtained in the course of their prior employment.  Ideas, whether "mere" or otherwise, are protected from misappropriation as long as they provide an opportunity to obtain a business advantage over competitors and are maintained in secret.  Hyde Corp. v. Huffines, 314 S.W.2d 763, 776-77 (Tex. 1958).

The evidence at trial was sufficient to show that Dr. Bianco maintained his ideas in secret, except to the extent that he disclosed them to Globus subject to an understanding that he would be fairly compensated if Globus were to use them.  The Court therefore rejects Globus's argument that Dr. Bianco's ideas were not entitled to trade secret protection because they were "mere ideas."

Globus next argues that Dr. Bianco changed his theory of liability at trial by seeking to define his trade secrets not only as the specific combination of particular elements identified by his expert, but also as the "core idea" for a continuously expandable interbody spacer for use in fusion surgeries.  Globus asserts that Dr. Bianco was "foreclosed" from changing his theory of liability at trial in that way.  Dr. Bianco, however, did not change his theory of liability.  Dr. Bianco's amended complaint alleged that he "possessed valuable trade secrets in the design of the expandable interbody spacer device."  Dkt. No. 103, at 6.  At trial, Dr. Bianco presented

17

evidence that his drawings disclosed such a device along with several key features also found in Globus's Caliber and Rise products.  1/14/14 PM Tr. 71-84.  Neither in his complaint nor at trial did Dr. Bianco suggest that his trade secret or secrets were limited to the precise combination of features found in his drawings or the exact design of the device depicted in the drawings.

Dr. Bianco's theory all along has been that his drawings disclosed an implant for use in fusion surgeries, along with certain key features, and that Globus used his trade secret when it developed such an implant with many of the same features.  Dr. Bianco has never claimed that his drawings disclosed the complete design of the Caliber and Rise devices; rather, his consistent claim has been that his drawings disclosed the fundamental concept for the implant along with several of its key features.

The jury was instructed, without objection, that a trade secret of the sort claimed in this case "consists of a combination of information" and that a "trade secret must be secret."  Dkt. No. 226, at 3.  The Court instructed the jury that "[t]here is no precise definition or formula for determining whether Dr. Bianco's disclosure actually constituted a trade secret."  Id. at 4. The Court provided the jury with six factors that "may be relevant to determining whether Dr. Bianco's disclosures constituted a trade secret":

> (1)  The extent to which the information is known outside Dr. Bianco's business;
> (2)  The extent to which others involved in Dr. Bianco's business knew the information;
> (3)  Measures taken by Dr. Bianco to guard the secrecy of the information;
> (4)  The value of the information to Dr. Bianco and his competitors;
> (5)  The amount of effort or money expended by Dr. Bianco in developing the information; and
> (6)  The ease or difficulty with which the information could be properly acquired or duplicated by others.

Id. at 4.

18

Given those instructions and the evidence in this case, the jury could reasonably have found that Dr. Bianco's idea for a continuously expandable spacer for use in fusion surgeries was a trade secret.  First, the idea for such a device and a description of its key features is a "combination of information."  Second, the evidence showed that Dr. Bianco kept his ideas secret, and in particular that he kept his drawings in a safe in his office.  1/13/14 PM Tr. 84.  In discussing the amount of effort that he expended in developing the information, Dr. Bianco relied on his years of experience in the field spine surgery.  Dr. Bianco testified that he performs between 250 and 300 fusion surgeries per year, id. at 65-66, and that he has been practicing as a neurosurgeon since at least 2005, id. at 56.  Dr. Bianco also offered evidence that, at the time of his 2007 disclosure to Globus, there were no other products on the market that embodied his idea.  1/14/14 PM Tr. 93.  The only expandable interbody spacer that existed at that time was a product known as StaXx, which expanded in discrete increments, instead of continuously, and could not be retracted once it was expanded.  Id. at 72-73.  The jury could therefore reasonably have found that Dr. Bianco's ideas were not well known at the time of his disclosure.  Finally, the jury could have inferred that his trade secret had value, based on the commercial success of the Caliber and Rise products and the evidence of the advantages conferred by a continuously adjustable and reversible spacer for fusion surgeries.

One of the main factual disputes at trial was whether Dr. Bianco's disclosure related to  a custom instrument that was to be made for him, or instead to an implant to be developed as a new Globus product.  Globus contended at trial that Dr. Bianco submitted his drawings as part of a request for Globus to prepare a customized instrument that he could use in spinal surgeries, and that his drawings did not relate to an implant at all.  Dr. Bianco, on the other hand, claimed he

intended his drawings to be a design for an adjustable implant and that Globus understood his ideas to be for an implant, not a surgical instrument.   Instruments, unlike implants, are not left in a patient's body after surgery and can be used in multiple surgeries on multiple patients.   There was conflicting evidence on this issue at trial, but the evidence was sufficient to allow the jury to conclude that Globus understood Dr. Bianco's drawings to relate to a spacer rather than an instrument.   In particular, Dr. Bianco's ideas were submitted on a form intended for new ideas, not for custom instruments; Mr. Rhoda directed Mr. Harris to have Dr. Bianco use the form for new ideas in submitting his proposal, not the form for custom instruments (PX107); Dr. Bianco's proposal was repeatedly referred to both by Dr. Bianco and by Globus employees as relating to a "spacer," not an "instrument" or "trial" (a term of art for a surgical instrument); and Mr. Harris told Dr. Bianco that his ideas would be submitted to Globus's "new products" committee, which met once a month to consider proposals for new products.

In sum, the evidence was sufficient to support the jury's conclusion that the ideas that Dr. Bianco submitted to Globus in July 2007 for an adjustable interbody spacer constituted trade secrets that were subject to protection under Texas trade secret law.

### 2. Breach of a Confidential Relationship

Globus next argues that, even if it used Dr. Bianco's ideas in connection with the Caliber and Rise products, Dr. Bianco failed to prove that Globus breached a confidential relationship with Dr. Bianco when it did so.   Globus points out that the jury found in Globus's favor on Dr. Bianco's breach of contract claim.   According to Globus, the jury's rejection of Dr. Bianco's breach of contract claim necessarily meant that Globus did not breach a confidential relationship

with him. Therefore, Globus asserts, an essential element of a claim for trade secret misappropriation is missing in this case.

Globus's argument on that point is entirely without merit. First, the jury's verdict was not inconsistent. Texas law makes it clear that an express confidentiality agreement is not required for liability in a trade secret misappropriation case, and that a duty of confidentiality can be implied from all the circumstances even when those circumstances do not give rise to a claim for breach of contract. See Hyde Corp. v. Huffines, 314 S.W.2d 763, 769-70 (Tex. 1958) (quoting Restatement (First) of Torts § 757 cmt. j (1939)) ("[W]hether or not there is a breach of contract, the rule . . . subjects the actor to liability if his disclosure or use of another's trade secret is a breach of the confidence reposed in him by the other in disclosing the secret to him."); Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131 151 nn.54-55 (citing cases); Phillips v. Frey, 20 F.3d 623, 631 (5th Cir. 1994) (express agreement need not be shown "where the actions of the parties and the nature of their relationship, taken as a whole, established the existence of a confidential relationship"); Zoecon Indus. v. Am. Stockman Tag Co., 713 F.2d 1174, 1178 (5th Cir. 1983) ("A confidential employment relationship can be established expressly by contract or can be implied from the nature of the relationship."); Zinco-Sherman, Inc. v. Adept Food Solutions, Inc., 2006 WL 1061917, at *2 (S.D. Tex. Apr. 21, 2006).

Texas law has identified two types of fiduciary relationships. "The first is a formal fiduciary relationship . . . . The second is an informal fiduciary relationship, which may arise from 'a moral, social, domestic or purely personal relationship of trust and confidence, generally called a confidential relationship.'" Abetter Trucking Co. v. Arizpe, 113 S.W.3d 503, 508 (Tex. App. 2003). When a claim of improper disclosure or use of trade secrets arises from a

21

confidential relationship, "the injured party is not required to rely upon an express agreement that the offending party will hold the trade secret in confidence." T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc., 965 S.W.2d 18, 22 (Tex. App. 1998); see Restatement (Third) of Unfair Competition § 41 (1995) ("A person to whom a trade secret has been disclosed owes a duty of confidence to the owner of the trade secret [if] . . . (1) the person knew or had reason to know that the disclosure was intended to be in confidence, and (2) the other party to the disclosure was reasonable in inferring that the person consented to an obligation of confidentiality."); Restatement (First) of Torts § 757 cmt. j (1939) ("The question is simply whether in the circumstances [the defendant] knows or should know that the information is [the plaintiff's] trade secret and that its disclosure is made in confidence.").

The holder of a trade secret may disclose it to others "to further the holder's economic interests" without "destroying its status as a trade secret. Metallurgical Indus. Inc. v. Fourtek, Inc., 790 F.2d 1195, 1200 (5th Cir. 1986); Ultraflo Corp. v. Pelican Tank Parts, Inc., 926 F. Supp. 2d 935, 959 (S D. Tex. 2013) (owner of a trade secret may disclose it to others "in furtherance of business transactions from which the owner expects to profit without losing trade secret protection."). If a voluntary disclosure occurs in a context "that would not ordinarily occasion public exposure and in a manner that does not carelessly exceed the imperatives of a beneficial transaction, then the disclosure is properly limited and the requisite secrecy retained." Taco Cabana Int'l, Inc. v. Two Pesos, Inc., 932 F.2d 1113, 1124 (5th Cir. 1991); see also Cloud v. Standard Packaging Corp., 376 F.2d 384, 388-89 (7th Cir. 1967) ("Where the facts show that a disclosure is made in order to further a particular relationship, a relationship of confidence may

be implied, e.g. disclosure to a prospective purchaser to enable him to appraise the value of the secret.").

In this case, the circumstances under which Dr. Bianco disclosed his ideas to Globus, including Globus's use of confidentiality agreements and Mr. Harris's recommendation that Dr. Bianco notarize his drawings for the protection of both parties provided an ample basis for concluding that the parties understood that they were entering into a confidential relationship. The jury was therefore entitled to find that Globus had an implied duty of confidentiality with respect to Dr. Bianco's disclosures, even if there was no express contractual undertaking between the parties. Likewise, the jury could reasonably find that the circumstances of Dr. Bianco's disclosure of his ideas to Globus did not result in a loss of their status as trade secrets.

Texas law makes clear that the very circumstance of disclosing an idea with the hope of generating interest in producing a new product is enough to create an obligation of confidentiality. For example, in <u>Phillips v. Frey</u>, 20 F.3d 623 (5th Cir. 1994), the defendant had entered into negotiations to purchase the plaintiff's hunting-stand business. During negotiations, the plaintiff disclosed his trade-secret manufacturing process to the defendant even though the parties never entered into an express confidentiality agreement. <u>Id.</u> at 625-26. After negotiations broke down, the defendant began using the plaintiff's manufacturing process without permission. The jury found that the defendant had misappropriated the plaintiff's trade secret. The court of appeals affirmed the jury's verdict and rejected the defendant's argument that there was insufficient evidence of a confidential relationship. The court held:

> Although [the plaintiff] never explicitly requested that the secret of his manufacturing process . . . be held in confidence, both parties mutually came to the negotiation table, and the disclosure was made within the course of

negotiations for the sale of a business.  The jury could validly accept such evidence that the defendants knew or should have known that the information was a trade secret and the disclosure was made in confidence.

Id. at 632.  The facts of this case are quite similar to those of Phillips.  Given the circumstances surrounding Dr. Bianco's disclosures, including the fact that he notarized his drawings, at Mr. Harris's urging, so as to protect both Dr. Bianco and Globus, see 1/13/14 PM Tr. 75, the jury could reasonably have found that Globus knew or should have known that Dr. Bianco's disclosure was a trade secret and that it was made in confidence.  See also Hyde Corp. v. Huffines, 314 S.W.2d at 769; Restatement (First) of Torts § 757 cmt. j (describing how a duty of confidence may exist in a situation in which "A discloses [his] secret to B solely for the purpose of enabling him to appraise its value").

The Court further notes that the breach of contract claim submitted to the jury related to the alleged promise made by Mr. Harris that Globus would not use Dr. Bianco's idea without compensating him.  The Court granted Globus judgment as a matter of law on Dr. Bianco's other breach of contract claim that Globus violated a nondisclosure agreement that allegedly protected Dr. Bianco's ideas.  The Court found that under the Texas lost-document rule, there was insufficient evidence that the nondisclosure agreement, a copy of which neither party could locate, protected Dr. Bianco and not just Globus.  1/17/14 AM Tr. 104-05.  The breach of contract claim submitted to the jury, therefore, did not involve an alleged contract that required confidentiality or nondisclosure, but only related to an alleged promise by Globus to compensate Dr. Bianco if it used his ideas.  Although the Court found the evidence on that claim sufficient to submit the issue  to the jury, it is entirely possible that the jury found that the evidence failed to show that Globus made a sufficiently concrete agreement to compensate Dr. Bianco at a

24

particular level and that it based its verdict on the breach of contract claim on that ground.  For each of those reasons, there is no inconsistency between the jury's verdict on the breach of contract claim and its verdict on the trade secret claim, despite Globus's contention to the contrary.

Even if the jury's verdict were considered inconsistent, Globus cannot take advantage of that inconsistency now, because Globus failed to raise the inconsistency issue at trial.  In the case of an inconsistent verdict there is no way of knowing, after the fact, which way the jury would have resolved the inconsistency if it had been required to do so.  In this case, for example, requiring the jury to cure the alleged inconsistency would not necessarily have led to a different verdict on the trade secret misappropriation claim; it could just as well have led to a different verdict on the breach of contract claim.  It is for that reason that courts have held, in cases such as this one, that a party waives its challenge to alleged inconsistencies in the verdict if it fails to raise them before the court discharges the jury.  Stancill v. McKenzie Tank Lines, Inc., 497 F.2d 529, 534-35 (5th Cir. 1974); see L&W, Inc. v. Shertech, Inc. , 471 F.3d 1311,  1318-19 (2006). Therefore, even if the Court concluded that the jury's verdict in this case was inconsistent, the verdict would stand because of Globus's failure to raise the issue of inconsistency before the jury was discharged.

### 3.  Use of the Trade Secrets

Globus next argues that there is insufficient evidence from which the jury could reasonably find that Globus used Dr. Bianco's trade secrets, as is required for a claim of trade secret misappropriation.  Globus first asserts that Dr. Bianco considered the use of a scissor-jack expansion mechanism with his spacer to be "an element of his trade secret combination."  Dkt.

No. 316, at 8.  As noted, the Caliber and Rise products use a ramp-based mechanism for expansion, not a scissor-jack mechanism.  Therefore, according to Globus, those products did not embody Dr. Bianco's trade secrets.  Again, however, Globus inappropriately seeks to import patent law concepts into Texas trade secret law.  As noted, Dr. Bianco did not limit his trade secret claims to the precise combination of features in his drawings.  Given that Dr. Bianco's trade secrets included the idea for a continuously adjustable interbody spacer with certain key features, the jury was entitled to find that Globus used that trade secret when it began pursuing the development and marketing of such a device with many of the features identified in Dr. Bianco's drawings.  See Dkt. No. 226, at 5 (jury instructions) (defining "use" of a trade secret to include "any exploitation of the trade secret that is likely to result in injury to the trade-secret owner or enrichment of the defendant" and "marketing goods that embody the trade secret").

Globus asserts that "Dr. Bianco testified that a scissor-jack mechanism was an element of his trade secret combination."  But in the portion of his testimony on which Globus relies, Dr. Bianco was merely responding to the question whether "one of your trade secrets was a scissor-jack mechanism?"  1/13/14 PM Tr. 146-47.  By responding affirmatively to that question, Dr. Bianco did not limit his claimed trade secrets in the way Globus suggests.  Instead, he merely indicated that the use of a scissor-jack expansion mechanism in an adjustable interbody spacer was one of his trade secrets.

Globus argues that in light of the substantial differences between the final Globus products and Dr. Bianco's drawings it was unreasonable for the jury to find that Globus used Dr. Bianco's trade secrets.  But the fact that Globus's final products differ in important ways from the device depicted in Dr. Bianco's drawings does not mean that Globus did not use any of Dr.

Bianco's trade secrets.  Dr. Bianco's trade secrets were not limited to devices with scissor-jack expansion mechanisms, but were defined more broadly by the overall idea for a product with several key features that were eventually implemented in the Globus devices.  Accordingly, it was reasonable for the jury to find that Globus used Dr. Bianco's ideas when it began to develop those devices.  The jury's finding in that regard was consistent with the Court's instruction (not objected to by Globus) that "'[u]se' does not require that a party use another's trade secret in the form in which it received it."  Dkt. No. 226, at 4.

Globus next asserts that the evidence at trial did not show that Globus relied on Dr. Bianco's trade secrets "to accelerate or assist its research or development."  Dkt. No. 316, at 8. In support of that contention, Globus points to the fact that Dr. Bianco did not participate in Globus's development efforts and to the lack of evidence that the lead engineers on the Caliber and Rise projects ever saw Dr. Bianco's drawings, were told about his disclosures, or even met Dr. Bianco.

Dr. Bianco does not dispute those facts.  Instead, the theory of use that Dr. Bianco presented to the jury, and that the jury could reasonably have accepted, was that his disclosures were the source of the basic product idea for Caliber and Rise.  That theory does not depend on proof that the Caliber and Rise engineers were directly exposed to Dr. Bianco's disclosures or Dr. Bianco himself.  Nor does that theory depend on proof that Dr. Bianco participated in the development process.  Instead, Dr. Bianco relies on evidence that his drawings were circulated among some of the senior executives at Globus shortly before Globus made plans to develop an adjustable interbody spacer.  That evidence includes evidence that senior Globus executives had Dr. Bianco's drawings before them when Mr. Lee sketched a rough design of a ramp-based

expansion mechanism on the back of the sheet of paper containing Dr. Bianco's drawings.  From that evidence, the jury could readily have concluded that the Globus executives who were responsible for planning the development of new products relied on Dr. Bianco's concept when they decided to develop a continuously expandable spacer, a decision that ultimately led to the Caliber and Rise projects, even though they decided to use a ramp-based expansion mechanism instead of the scissor-jack mechanism depicted in Dr. Bianco's drawings.

Finally, Globus points to the evidence that the contributions of the lead engineers on Caliber and Rise—Mr. Glerum and Mr. Weiman—were essential to producing a commercially viable product.  The evidence showed that the ramp-based expansion concept was important in making the Caliber and Rise products both compact and physically strong, as is required for a successful spinal fusion implant.  The evidence further showed that the ramp-based adjustment mechanism was devised by Globus's engineers, not by Dr. Bianco.

The verdict reflects the jury's recognition of the substantial contribution that Globus and its engineers made to the development of Caliber and Rise, since the jury refused to grant Dr. Bianco disgorgement of all of Globus's profits, as he requested.  The jury instead awarded Dr. Bianco significantly less by way of a royalty equivalent to five percent of Globus's profits from the Caliber and Rise products.  The fact that Globus's contributions to the development of Caliber and Rise were substantial, however, does not mean that Globus did not use Dr. Bianco's trade secrets by developing the product he proposed with many of the key features depicted in his drawings.  The Globus engineers did not claim that they were responsible for the overall concept of a continuously expandable and reversible interbody spacer for use in fusion surgeries. Nor has Globus pointed to any evidence that it independently came up with the idea for such a

28

device.  The Court therefore concludes that there was sufficient evidence from which the jury could have found that Globus used Dr. Bianco's trade secrets when it set out to design and develop the Caliber and Rise products.

### C.  Motion for Remittitur or a New Trial on Damages

### 1.  Sufficiency of the Evidence Supporting the Jury's Damages Award

Globus argues that the evidence at trial did not justify the award of reasonable royalty damages equivalent to five percent of Globus's profits on the Caliber and Rise products.  Globus asserts that the jury's $4,295,760 award of a reasonable royalty on past sales was excessive and asks the Court for remittitur of the damages award or a new trial on the issue of damages.

The Court concludes that the jury's damages award was supported by the evidence at trial and that Globus has not satisfied the high burden required to justify remittitur or a new trial on damages.  Although the jury's damages award is toward the high end of royalties that Globus has paid in the past, it is not unreasonable.  To support his argument that a royalty in the range of five to six percent was reasonable, Dr. Bianco pointed to other royalty agreements Globus had entered into in that range.  Given that the evidence supported a finding that Dr. Bianco contributed the core idea for the Caliber and Rise products, including several of those products' essential features, the jury could reasonably find that Dr. Bianco's contributions were analogous to the contributions of those who had received such royalty rates from Globus in the past.

In large part, Globus's arguments about damages are an attack on Dr. Bianco's theory of liability.  Globus argues that Dr. Bianco failed to prove two assumptions that his damages expert, Dr. Stephen Becker, relied on in forming his opinion that a hypothetical royalty negotiation between Dr. Bianco and Globus would have resulted in a royalty of five percent.  1/15/14 AM

29

Tr. at 46.  Globus first argues that the evidence failed to support Dr. Becker's assumption that "Dr. Bianco's alleged trade secrets led to the invention" of the Caliber and Rise products.  Dkt. No. 316, at 11.  The Court has already determined, however, that there was sufficient evidence from which the jury could find that Globus used Dr. Bianco's trade secrets in exactly the way Dr. Becker assumed.

Globus's second argument is that the evidence did not support Dr. Becker's assumption that other surgeons on the design teams for the Caliber and Rise products "provided only incremental improvements to the products."  Dkt. No. 316, at 11.  Globus's argument is that the five percent royalty the jury awarded to Dr. Bianco is excessive, in that it is significantly higher than the one-half of one percent royalty received by most of the surgeons who were members of product development design teams at Globus, including the product development teams for the Caliber and Rise products.  Globus asserts that Dr. Bianco's contributions, if any, were relatively minor and unimportant and therefore do not warrant a royalty in excess of one-half of one percent.  Dr. Bianco responds that because his trade secrets included the overall product itself, along with most of its essential features, his ideas were extremely important to the development of Caliber and Rise, much more so than the contributions of the surgeons on Globus's design teams.  On Dr. Bianco's theory, his ideas provided the impetus, or the "sparkle" as he put it, 1/13 PM Tr. 50, for the development of Caliber and Rise at Globus.

Globus asserts that it typically used what it calls the "industry standard royalty rate" of one-half of one percent of profits to compensate surgeons on its design teams who served as consultants in the development of medical devices, although some of the surgeon members of Globus design teams received significantly more than that.  Of the four agreements in evidence

in which Globus granted a royalty rate greater than two percent to individuals or entities, see 1/15/14 AM Tr. 74, Globus argues that three of those agreements involved instances in which Globus purchased "a completed product owned by companies that Globus acquired."  Dkt. No. 316, at 12.  Globus therefore asserts that the royalty agreements paying royalties between five and six percent of Globus's profits did not arise from situations that were sufficiently comparable to the hypothetical royalty negotiation at issue in this case.  See LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 79 (Fed. Cir. 2012) (requiring, in the patent context, that licenses relied on by a patentee to prove damages be "sufficiently comparable to the hypothetical license at issue in suit").  For that reason, Globus asserts, the evidence of comparable royalty agreements shows that Dr. Bianco is entitled to no more than the one-half of one percent royalty rate that Globus typically paid to each design team doctor.

The jury, however, was presented with evidence that Dr. Bianco's contributions were different in kind from those of the ordinary design team doctors.  Dr. Bianco's evidence suggested that design team doctors typically provided merely "refinements" to already existing ideas, not proposals for a whole new product.  1/13/14 PM Tr. 91-92, 131-32 (Dr. Bianco); 1/15/14 AM Tr. 69-70 (Dr. Becker); 1/15/14 PM Tr. 48-49 (Mr. Glerum).  A number of doctors on the design teams for the Caliber products submitted affidavits that were read to the jury, in which they stated that although they did not significantly contribute to the conception of the patent related to the Caliber insert, they participated in the design and development of the Caliber products and believed that their participation was significant.  None of the doctors' affidavits described the nature of their contributions, however.  1/14/14 AM Tr. 194-214.  The jury was therefore faced with the task of resolving factual disputes over how to characterize Dr. Bianco's

contributions and how his contributions compared to the contributions of those who were the beneficiaries of the various Globus royalty agreements in evidence.  Based on Dr. Bianco's theory that his ideas led to the development of the Caliber and Rise products, the jury could reasonably find that Dr. Bianco's contributions were greater than the contributions of the physicians on the Caliber and Caliber-L design teams and were similar in kind to the contributions provided by those who had previously received royalty rates in the range of five to six percent from Globus.

In several of those instances, as noted, Globus procured the rights to products or product ideas that would have been unavailable to Globus without the contribution of the licensor.  In another instance, a  six percent royalty was paid to a physician who, as Globus explained, was "a world-renowned doctor who was the sole surgeon on the design team."  Dkt. No. 316, at 12; 1/15/14 AM Tr. 74; 1/17/14 AM Tr. 38-39.  Although Globus paid royalty rates as high as five to six percent in only a few instances, the jury was entitled to conclude from the evidence at trial that Dr. Bianco's contribution of the concept and basic design for the adjustable interbody spacer was analogous to the contributions of those who had received royalties in that range.  Based on that evidence, the jury could permissibly find that a royalty of five percent of Globus's profits on the Caliber and Rise products was appropriate.

Globus takes further issue with Dr. Becker's reasonable royalty analysis because Dr. Becker used as a starting point a four percent royalty, based on an aggregation of the total royalty rate paid to the surgeons on the Caliber design team.  Globus asserts that the four percent rate is arbitrary because, if Dr. Becker had used the combined design team royalty rates from Caliber-L or Rise, he would have arrived at a different starting point rate.  Globus adds that there is "no

evidence that any other agreements were based on an aggregated royalty rate." Dkt. No. 316, at 13.

Globus's arguments as to Dr. Becker's methodology have little force. The Court rejected similar arguments when it addressed Globus's pretrial <u>Daubert</u> motion. Dkt. No. 196. As the Court noted at that time, Dr. Becker's principal assumption was that "Dr. Bianco's contribution to the development of the devices was much greater than that of the other surgeons, even viewed in the aggregate." <u>Id.</u> at 4. Given the evidence that the suggestions provided by design team doctors about a product already in development are different in kind from the ideas disclosed by Dr. Bianco for a whole new product that was not yet being developed, the jury could reasonably have accepted Dr. Becker's assumption. Furthermore, Dr. Becker testified that his starting-point royalty rate was supported by the existence of the Globus royalty agreements that paid between five and six percent. 1/15/14 AM Tr. 74. His selection of a four percent starting-point rate was therefore supported by the evidence and was not arbitrary.

Relatedly, Globus challenges Dr. Becker's opinion that his four-percent starting point for calculating the hypothetical royalty should be adjusted upward by one percent to account for the particular facts of this case. That opinion, according to Globus, was "based on nothing more than his unsubstantiated judgment." Dkt. No. 316, at 14. Dr. Becker, however, explained the one-percent increase by noting that many of the features that Globus has touted as important advantages of Caliber and Rise were in fact found in Dr. Bianco's July 2007 disclosure to Globus. 1/15/14 AM Tr. 76. Additionally, Dr. Becker pointed to evidence that Caliber is a "key differentiating product for Globus" that has proved highly profitable. <u>Id.</u> at 77. Dr. Becker's

opinion therefore was not unsubstantiated, but was explained to the jury and based on his opinion as a qualified expert.

Globus argues that Dr. Becker "wrongly assumed that Dr. Bianco singlehandedly conceived of the inventions embodied" in the Caliber and Rise products and that Dr. Becker's assumption "is entirely refuted" by the Court's reasoning in denying Dr. Bianco's claim to be named as an inventor on Globus's patents on adjustable interbody spacers. Dkt. No. 316, at 13 n.2. Dr. Becker, however, made no such assumption. Dr. Becker simply assumed that Globus used Dr. Bianco's trade secrets. See 1/15/14 AM Tr. 65. As the Court explained in its order on inventorship, "[t]here is no inconsistency between the jury's finding that Globus misappropriated Dr. Bianco's trade secrets and the Court's ruling that Dr. Bianco is not entitled to be named as an inventor" on Globus's patents. Dkt. No. 262, at 20. The requirement in patent law that an inventor contribute the "conception" of an invention has no parallel in the law of trade secrets. Compare Burroughs Wellcome Co. v. Barr Labs., Inc., 40 F.3d 1223, 1227 (Fed. Cir. 1994) ("Conception is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice."), with In re Bass, 113 S.W.3d 735, 739 (Tex. 2003) ([A] trade secret is "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." (emphasis added)).

Finally, Globus argues that "Dr. Becker's opinions about the proper royalty rate were all based on the flawed assumption that 'a hypothetical negotiation over the future royalty rate would have occurred after the success of Globus's expandable spacer products had been established.'" Dkt. No. 316, at 14. That assumption was not warranted, Globus asserts, because

the 2007 hypothetical negotiation between Dr. Bianco and Globus would have occurred before

Caliber and Rise were developed and therefore before it was known that those products would be

successful.  Globus's argument in that regard fails for several reasons.

First, Globus waived any argument about Dr. Becker's assumptions with respect to the

commercial success of the Caliber and Rise products.  Although Globus challenged the reliability

of Dr. Becker's opinions on other grounds prior to trial, it never challenged his opinions as being

unreliable because they took into account the commercial success of the Caliber and Rise

products.  See Dkt. No. 110 (Globus motion to strike); Dkt. No. 164 (supplemental motion to

strike).  Nor did Globus object to Dr. Becker's testimony at trial on that ground.  Globus cannot

raise what is essentially an objection to the admissibility of Dr. Becker testimony under Federal

Rule of Evidence 702 at this late stage as part of a motion for remittitur or a new trial on

damages.  See Fed. R. Evid. 103(a); Perdue v. Nissan Motor Co., 2009 WL 2460988, at *2 (E.D.

Tex. Aug. 10, 2009); z4 Techs., Inc. v. Microsoft Corp., 2006 WL 2401099, at *9 (E.D. Tex.

Aug. 18, 2006); Estate of Bynum v. Magno, 55 F. App'x 811, 813 (9th Cir. 2003) ("A party who

fails to make a contemporaneous objection to the introduction of testimony at trial forfeits its

right to contest the use of that evidence in a motion for judgment as a matter of law."); New Mkt.

Inv. Corp. v. Fireman's Fund Ins. Co., 774 F. Supp. 900, 917-18 (E.D. Pa. 1991) ("[I]t is well-

settled under the caselaw and clear under Rule 103(a)(1) . . . that the failure to timely object to

the admission of evidence constitutes a 'waiver' of such objection for purposes of post-trial

review.").

On the merits, Dr. Becker's decision to take into account the commercial success of the

Caliber and Rise products in his "hypothetical negotiation" analysis did not render his opinion as

to the reasonable royalty legally deficient.    Courts, including the Supreme Court, have recognized in the analogous patent-law context "that factual developments occurring after the date of the hypothetical negotiation can inform the damages calculation." Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1333 (Fed. Cir. 2009), citing Sinclair Ref. Co. v. Jenkins Petroleum Process Co., 289 U.S. 689, 698 (1933); see also Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1276-77 (Fed. Cir. 1999) (noting that Federal Circuit case law requires neither the admission nor the exclusion of post-infringement evidence); Fromson v. W. Litho Plate & Supply Co., 853 F.2d 1568, 1575 (Fed. Cir. 1988) (stating that a reasonable royalty "speaks of negotiations as of the time infringement began, yet permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators"), overruled on other grounds by Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp, 383 F.3d 1337 (Fed. Cir. 2004).

Such post-infringement developments have been referred to as a "book of wisdom" on which a finder of fact may rely. Sinclair, 289 U.S. at 698.   "The jury may consider the infringer's actual sales and revenue up to the date of trial as part of the 'book of wisdom.'" Ariba, Inc. v. Emptoris, Inc., 567 F. Supp. 2d 914, 917 (E.D. Tex. 2008); see Finjan, Inc. v. Secure Computing Corp., 626 F.3d 1197, 1210 (Fed. Cir. 2010) (use of actual profit margins probative of profits anticipated by the parties in a hypothetical negotiation); Trell v. Marlee Elecs. Corp., 912 F.2d 1443, 1446 (Fed. Cir. 1990) ("[I]n determining the result of . . . a hypothetical negotiation, the district court may consider the infringer's anticipated profits, as indicated by evidence of actual profits."); Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc., 750 F.2d 1552, 1568 (Fed. Cir. 1984) ("Evidence of the infringer's actual profits generally is

admissible as probative of his anticipated profits" at the time of a hypothetical negotiation.); z4 Techs., 2006 WL 2401099, at *10 ("Evidence of an infringer's actual profits [is] generally admissible when calculating a 'reasonable royalty.'").

The Court thus rejects Globus's argument that it was improper for Dr. Becker to take into account the commercial success of the Caliber and Rise products when determining a reasonable royalty. The commercial success and the importance of Caliber and Rise to Globus is probative of what the parties could reasonably have anticipated to be the prospective value of Dr. Bianco's trade secrets in a 2007 hypothetical negotiation. Given the probative value of that evidence and Globus's failure to raise an objection to the admissibility of Dr. Becker's opinion before or during trial on that ground, this case is similar to Finjan, in which the Federal Circuit stated:

> [The plaintiff's] use of the actual profit margins that both [defendants] experienced on products after that date was simply as a reflection of the profits the parties might have anticipated in calculating a reasonable royalty in the hypothetical negotiation. [The plaintiff's] testimony was subject to cross-examination, and the Defendants did not object to the use of actual profits in general as a basis on which to gauge expected profits in the hypothetical negotiation.

626 F.3d at 1210.

In sum, the jury's award of a reasonable royalty equivalent to five percent of Globus's net sales from the Caliber and Rise products is supported by the evidence at trial and cannot be said to be against the great weight of the evidence. The Court therefore rejects Globus's argument that the jury's award of damages should be overturned and a new trial granted on the issue of damages based on the insufficiency of the evidence to support the jury's damages award.

### 2. Apportionment of the Royalty Base

Globus argues that a new trial should be ordered on the issue of damages because the jury failed to apportion the royalty base it used to calculate damages after it had selected five percent as the appropriate royalty rate. Based on its contention that Dr. Bianco's contributions to the Rise and Caliber products were minor at best, Globus asserts that Dr. Becker and the jury should have taken into account the fractional value of Dr. Bianco's contributions to the Caliber and Rise products both in calculating the royalty rate and in calculating the royalty base to which that rate was applied. Globus's argument, however, is based on a view of Dr. Bianco's trade secrets that the jury rejected when it found Globus liable for misappropriation. Moreover, Globus's argument is not supported by the Federal Circuit cases on which it relies and is contrary to Globus's own licensing practices.

Globus's apportionment argument is based on the "entire market value rule," which the Federal Circuit has applied in patent cases. The entire market value rule provides that if a patentee seeks a royalty base equivalent to the entire market value of the accused product, the patentee must prove that "the patent-related feature is the basis for customer demand." Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1549 (Fed. Cir. 1995) (en banc) (citations omitted). If the patented feature is not the basis for customer demand, the royalty base must be apportioned according to the value of the portion of the accused product that infringes the patent. Thus, "in any case involving multi-component products, patentees may not calculate damages based on sales of the entire product, as opposed to the smallest salable patent-practicing unit, without showing that the demand for the entire product is attributable to the patented feature." LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 67-68 (Fed. Cir. 2012); see also

Lucent Techs., 580 F.3d at 1336 ("For the entire market value rule to apply, the patentee must prove that the patent-related feature is the basis for customer demand.") (emphasis in original); Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1320-21 (Fed. Cir. 2011) (same).  Where the smallest salable unit is "a multi-component product containing several non-infringing features with no relation to the patented feature," the patentee must apportion damages only to the patented feature or features.  VirnetX, Inc. v. Cisco Sys., Inc., No. 2013-1489 (Sept. 16, 2014), slip op. 29-32.

The entire market value rule is designed to deal with cases in which infringement by a multicomponent device relates to only one sub-component of that device.  Such a situation might arise, for example, where the owner of a patent for an inventive electronic component sues an automobile manufacturer for infringement because that manufacturer's automobiles include CD players that use the accused electronic component.  In such cases, there is a substantial risk that a jury will overcompensate the plaintiff if the royalty base is derived from, for example, the sales of the entire product (e.g., the automobile), as opposed to sales of the "smallest salable patent-practicing unit" (e.g., the electronic component within the CD player).  See VirnetX, slip op. 14-15; LaserDynamics, 694 F.3d 51, 67 (Fed. Cir. 2012).

As a matter of logic, there is nothing inherently wrong with using the entire market value of a product as the royalty base, as long as the royalty rate is selected appropriately.  See Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1338-39 (Fed. Cir. 2009) ("[T]he base used in a running royalty calculation can always be the value of the entire commercial embodiment, as long as the magnitude of the rate is within an acceptable range (as determined by the evidence).").  The problem is that in complex products with hundreds or thousands of component

parts, the royalty rate that would be reasonable when the entire market value is used as the royalty base may be an extremely small fraction of a percentage, which a jury would be unlikely to choose after finding a defendant liable for infringement.  See Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1320-21 (Fed. Cir. 2011) (plaintiff's attack on defendant's expert for proposing a reasonable royalty of 0.00003 percent of the entire market value of Microsoft software products for the accused product-activation feature "may have inappropriately contributed to the jury's rejection of his calculations").  When the entire market value is used as the royalty base, the Federal Circuit views the risk of prejudice to the defendant as sufficiently serious that the court has held that "the requirement to prove that the patented feature drives demand for the entire product may not be avoided by the use of a very small royalty rate." LaserDynamics, 694 F.3d at 67.

This case is not like the Federal Circuit cases that have found fault with a jury's award of a reasonable royalty based on the entire market value of a product.  Those cases have all dealt with the prototypical fact pattern in which the infringing feature in the accused product is a minor subcomponent of, or makes a minor contribution to, the overall product.  See VirnetX, slip op. 32 (plaintiff failed "to apportion the royalty down to a reasonable estimate of the value of its claimed technology"); LaserDynamics, 694 F.3d at 68 (plaintiff failed to show that patented method for discriminating between the types of discs inserted into an optical disc reader drove demand for laptop computers); Uniloc, 632 F.3d at 1320 (infringing software activation feature in accused Microsoft software products); Lucent, 580 F.3d at 1332, 1336-39 (accused date-picker feature in Microsoft Outlook software was "but a tiny feature of . . . an enormously complex software program comprising hundreds, if not thousands or even more, features.").

40

In this case, however, Dr. Bianco's trade secret was the idea for the adjustable interbody spacer itself.  Dr. Bianco's trade secrets did not relate to only a single subcomponent or feature of the Caliber and Rise products; instead, they related to the overall idea for a continuously adjustable and reversible interbody spacer for use in fusion surgeries and included many of the key features disclosed in Dr. Bianco's drawings.  Therefore, even assuming that the Federal Circuit's strict requirements for applying the entire market value rule apply in this case under Texas trade secret law, Dr. Bianco met his burden of proof when he presented the jury with sufficient evidence to support his theory of trade secret misappropriation.  In other words, the Caliber and Rise products are the "smallest salable units" that reflect the use of Dr. Bianco's trade secrets.

In a notice of supplemental authority submitted after its motion, Globus argues that the recent decision of the Federal Circuit in VirnetX demonstrates that Dr. Bianco's "damages model cannot support a reasonable royalty award."  Dkt. No. 336.  VirnetX, however, simply applied the principles of the entire market value rule to a situation in which the smallest salable unit contains significant unpatentable features.  VirnetX, slip op. 32.  In that situation, the scope of the defendant's infringement cannot fairly be said to extend to the entire accused product, or even the smallest salable unit of that product.  In the present case, by contrast, the jury was entitled to find that the scope of the appropriation extended to the entire Caliber and Rise line of products, since what was alleged to have been appropriated was the idea for an adjustable interbody spacer and the combination of the basic features of such a spacer, which were incorporated in the Caliber and Rise devices.  In that setting, the entire market value rule does

not require that the royalty base be apportioned among features of the device in question.  See Univ. of Pittsburgh v. Varian Med. Sys., Inc., 561 F. App'x 934, 946-47 (Fed. Cir. 2014).[4]

The justification for treating the Caliber and Rise products as the fruit of the appropriated trade secrets (or, in the terms used in the patent context, the "smallest salable units" that represent what Globus appropriated) is not undercut by the fact that Globus and its engineers contributed substantially to the design and development of those products.  Nor is the jury's finding undercut by the fact that Globus implemented Dr. Bianco's trade secrets with an expansion mechanism different from the one depicted in Dr. Bianco's drawings.  The jury took into account the relative contributions of Dr. Bianco and Globus when it awarded Dr. Bianco a five percent royalty.  Given that the jury declined to award Dr. Bianco complete disgorgement of all of Globus's profits from the Caliber and Rise products, the jury's verdict is best viewed as based on a conclusion that Globus's contributions to the development and commercialization of those products were important enough that Dr. Bianco's share of the profits on those products should be limited to five percent.  Because the jury's choice of a royalty rate was reasonable, there is no reason to doubly discount Dr. Bianco's contributions to the overall product

---

[4]  Globus points to other cases that, like VirnetX, recognize that further apportionment of the royalty base beyond the base associated with the smallest salable unit is required when the patent relates to something less than the smallest salable unit.  See Dynetix Design Solutions, Inc. v. Synopsys, Inc., 2013 WL 4538210, at *3 (N.D. Cal. Aug. 22, 2013); Personalized Media Commc'ns, LLC v. Zynga, Inc., 2013 WL 5979627, at *2 (E.D. Tex Nov. 8, 2013).  That proposition, however, does not apply to a case such as this one in which the smallest salable unit embodying a use of protected intellectual property is the entire product itself.  In fact, the decision in Personalized Media makes precisely that point.  The court in that case found that the entire market value of the products accused of patent infringement was an appropriate royalty base because plaintiff's theory was that "each accused [product], as a whole, infringes the patents-in-suit."  2013 WL 5979627, at *2.

development of Caliber and Rise by further reducing the royalty base by apportionment, as Globus requests.

Globus's practice of routinely using the profits on its devices as the royalty base in its royalty agreements provides further support for the royalty base applied in this case. Unlike in the Federal Circuit cases dealing with the entire market value rule, in this case the evidence showed that Globus's regular practice was to grant royalties based on the net sales of its products. For example, all of the royalty agreements between Globus and the surgeons on the design teams for Caliber, Caliber-L, and Rise used as the royalty base the full net sales of the respective product. Dr. Becker testified that he reviewed more than 200 Globus royalty agreements and found that "the running royalty structure is standard" in those agreements and that all of the agreements were "of this rate-times-base structure." 1/15/14 AM Tr. 67-68. The parties have not pointed to any Globus royalty agreement providing for a royalty base of anything less than the net sales of the entire product in question. Dr. Becker testified that "[i]n Globus' case, when they do royalty agreements, we've actually looked at the agreements and see that they define the thing that you—where you multiply the rate times something called net sales." Id. at 79; see also id. at 84. The jury's choice of net sales as the royalty base was therefore entirely consistent with the evidence as to the manner in which Globus typically compensates those who contribute to the development of its products.

As part of its apportionment argument, Globus contends that the royalty base should have been apportioned because all of the individual elements of Dr. Bianco's trade secrets are in the public domain. According to Globus, Dr. Bianco's trade secrets amounted to nothing more than ideas to improve upon spacers already found in the market at the time Dr. Bianco disclosed his

ideas to Globus.  Therefore, Globus asserts, Dr. Bianco is entitled to only the incremental value provided by that improvement.  As noted, however, Dr. Bianco's idea for an improvement over already-existing spacers took the form of an idea for a complete product with certain key features.  To the extent that Dr. Bianco's ideas represent mere improvements over already existing technology, the same could be said about the Caliber and Rise products themselves, as well as countless other inventions.  Globus's argument does not lead to the conclusion that the royalty base must be apportioned.

Globus next asserts that "the sole difference" between the spacer shown in Dr. Bianco's drawing and the intervertebral spacers that were commercially available when Dr. Bianco disclosed his drawing to Globus in 2007 was the use of a scissor-jack expanding mechanism. Dkt. No. 316, at 18.  That assertion, however, is not supported by the evidence.  Instead, the evidence established that most commercially available spacers were static, i.e., not expandable, and that the only available expandable spacer—StaXx XD—was not continuously expandable or reversible.  1/14/14 PM Tr. 72-73.  Dr. Bianco therefore disclosed ideas for improvements to existing spacer technology beyond the mere use of a scissor-jack mechanism.

In support of its argument that Dr. Bianco's disclosures contained nothing new, Globus argues that Dr. Bianco's disclosures added nothing of substance to the features found in the preexisting Medtronic Scissor Jack surgical instrument.  As explained above, however, the jury rejected Globus's theory that Dr. Bianco disclosed an instrument to Globus, not an implant.  The jury therefore found that Dr. Bianco's disclosure was of a product fundamentally different from the Medtronic Scissor Jack instrument.

44

Relatedly, Globus contends that "[t]he damages model that Dr. Becker presented to the jury did not value Dr. Bianco's trade secret information in the context of an improvement of readily available public information in 2007." Dkt. No. 316, at 19.  However, Dr. Becker stated that in forming his opinion on damages he considered the advantages that Dr. Bianco's ideas provided relative to preexisting spacers on the market, as explained by Dr. Bianco's technical expert.  See 1/15/14 AM Tr. 75-76 (Dr. Becker); 1/14/14 PM Tr. 72-74 (Dr. McMillin).  Globus's contention about Dr. Becker's damages model is therefore inaccurate.

Accordingly, the Court concludes that the use of the net sales of the Caliber and Rise products as the royalty base for calculating damages without further apportionment was legally appropriate and was supported by the evidence at trial.  The Court therefore denies Globus's motion to overturn the verdict or grant a new trial on the ground that apportionment of the royalty base was required beyond the apportionment reflected in the jury's decision to award Dr. Bianco five percent of the net sales of the Caliber and Rise products.

### 3.  Future Royalties

Globus argues that the Court erred when it granted Dr. Bianco an ongoing royalty of five percent of Globus's profits on the post-verdict sales of the Caliber and Rise products and products not colorably different from those products.  See Dkt. No. 311, at 22.  According to Globus, there is no authority under Texas law for such a remedy in a trade secret case.  Globus's argument is unpersuasive.

Globus argues that because trade secret misappropriation under Texas law is not a continuing tort, see Tex. Civ. Prac. & Rem. Code § 16.010(b), Texas law does not support the award of an ongoing royalty.  The law is clear, however, that ongoing or continuing damages can

result from a tort that is not a continuing tort, including the tort of trade secret misappropriation. See Gen. Universal Sys., Inc. v. HAL, Inc., 500 F.3d 444, 452 (5th Cir. 2007); Daboub v. Gibbons, 42 F.3d 285, 291 & n.9 (5th Cir. 1995).  Under Globus's theory, the reasonable royalty damages to which Dr. Bianco would be entitled would depend arbitrarily on the date of the jury's verdict.  If the trial had occurred earlier—if, for example, Dr. Bianco had filed his lawsuit earlier—Globus's theory would limit Dr. Bianco to a reduced damages award because there would have been fewer sales of the Caliber and Rise devices to account for in the calculation of a reasonable royalty.  The damages suffered by Dr. Bianco, however, are not dependent on the date that the jury rendered its verdict.   The Court sees no basis under Texas law to arbitrarily limit Dr. Bianco's damages in that way just because the tort of trade secret misappropriation is not a continuing tort.

Providing for an ongoing royalty was the only way, under the circumstances, for the Court to ensure that Dr. Bianco would receive fair compensation for his loss.  At trial, neither party argued or presented evidence that a hypothetical negotiation between Globus and Dr. Bianco would have resulted in a one-time lump sum royalty payment to Dr. Bianco.  Instead, the evidence and argument at trial with respect to reasonable royalty damages focused exclusively on running royalties.  See 1/15/14 AM Tr. 67-68 (Dr. Becker testifying that a running royalty method was used in all of Globus agreements he reviewed).  An ongoing royalty award was therefore the only practical means to ensure that Dr. Bianco would be fully compensated for the injury the jury found he suffered.

Globus argues that the Court erred in relying on Hyde Corp. v. Huffines, 314 S.W.2d 763 (Tex. 1958), and Bryan v. Kershaw, 366 F.2d 497 (5th Cir. 1966), when it ruled that Texas law

supports the award of an ongoing royalty.  According to Globus, those cases are not suitable precedents for an award of ongoing royalties because they involved injunctions, not the grant of future damages.  That argument, however, misses the point.  The Court relied on Hyde and Bryan because those cases show that under Texas law, courts fashioning equitable relief for trade secret misappropriation have the discretion to award such relief perpetually, that is, beyond the date of the verdict and even beyond the date when the trade secret is no longer a secret.  In fact, under Texas law, it is Globus's burden "to show by competent evidence that an order of less duration than a permanent order will afford the injured party adequate protection." Hyde, 314 S.W.2d at 776.  If Texas law allows courts to grant prospective equitable relief that would have completely and permanently barred Globus from continuing to sell the Caliber and Rise products, then it is surely permissible for a court to grant equitable relief that is significantly less burdensome, in the form of an ongoing royalty with a cut-off date.  The reason why Dr. Bianco was not awarded a permanent injunction in this case was because the Court found that monetary relief would be adequate to compensate Dr. Bianco for his injuries.  See Dkt. No. 269, at 17 (no irreparable injury because monetary damages would be sufficient); id. at 18-19 (availability of monetary relief for Dr. Bianco "largely decides" the balance of hardships).  It would be perverse for the Court to hold that, having denied injunctive relief because of the availability of a monetary award for future injuries, such a monetary award is not available after all.

Globus also asserts that in its decision awarding future royalties, the Court erred by relying on Sikes v. McGraw-Edison, 665 F.2d 731 (5th Cir. 1982).  In Sikes, the Fifth Circuit applied Texas law and awarded reasonable royalty damages extending beyond the period of the "head start" gained by the defendant through its trade secret misappropriation.  The Court cited

47

the case in response to Globus's argument that damages in a trade secret case are limited to the "head start" that the defendant gained by misappropriating the plaintiff's trade secret. Sikes thus shows that Globus's "head start" theory of damages is not mandated by Texas law.

In reaching that conclusion, the Sikes court relied on the fact that the circumstances suggested that a reasonable royalty negotiation would likely have resulted in a royalty payable for the life of the defendant's product, not just for a "head start" period. See Sikes, 665 F.2d at 737. Therefore, although Sikes does not explicitly stand for the proposition that equitable relief in the form of a reasonable royalty is authorized under Texas law, it stands for the unremarkable proposition that relief in a reasonable royalty case under Texas law should be based on what the evidence suggests the parties would have agreed to in a hypothetical negotiation. See University Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518, 538-39 (5th Cir. 1974). In this case, the evidence of Globus's royalty practices is that Globus pays royalties for the life of a product, subject to a fifteen-year maximum period starting from the date of the agreement. In exercising its discretion to award equitable relief, the Court therefore deemed it fair and equitable to award Dr. Bianco ongoing royalties that would ensure that his total compensation would be consistent with the jury's verdict and with the evidence of what he would have received had he reached an agreement with Globus regarding the use of his trade secrets in 2007. Globus's assertion that reasonable royalties are not appropriate for torts that are not "continuing" is simply not grounded in law, logic, or principles of equity.

Globus next argues that if the Court decides to let its award of future royalties stand, it should reduce the ongoing royalty rate to one-half of one percent. That argument simply reprises Globus's argument that the jury's award of damages equivalent to a five percent ongoing royalty

is not supported by the evidence.  The Court therefore rejects Globus's argument with respect to ongoing royalties for the same reasons that it rejected Globus's argument with respect to past damages.

Finally, Globus argues that the Court's award of an ongoing royalty to Dr. Bianco should be confined to Globus's sales of Caliber, Caliber-L, and Rise, and that the award should not extend to products that are not colorably different from those products.  According to Globus, the concept of colorable differences is a concept from patent law that "has no relevance to a trade secret case."  Dkt. No. 316, at 24.  That is so, Globus argues, because trade secrets are "defined by the use made of information, and not by the metes and bounds of the underlying subject matter."  Id.  That distinction has no force in this context, however.  If Globus were to start selling products virtually identical to the Caliber, Caliber-L, and Rise devices, but under a different name, those sales would still be the products of the misappropriation of Dr. Bianco's trade secrets.  There is no reason to create such a glaring loophole in the Court's remedial order.  See Reingold v. Swiftships, Inc., 126 F.3d 645, 651 (5th Cir. 1997) ("If the trade secret law were not flexible enough to encompass modified or even new products that are substantially derived from the trade secret of another, the protections that the law provides would be hollow indeed.").  Equity demands that Globus cannot escape liability by making trivial changes to the Caliber and Rise products as an end run around this Court's judgment.  The Court will therefore deny Globus's motion to amend the judgment with respect to future royalties.

The "colorably different" clause that the Court has included in the remedial order is similar to the "colorably different" standard that is frequently used in connection with injunctions in patent cases.  In that context, the clause has been found necessary to an effective

injunctive order and has been upheld against challenges that it is impermissibly vague.  See Oakley, Inc. v. Sunglass Hut Int'l, 316 F.3d 1331, 1346 (Fed. Cir. 2003); Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc., 986 F.2d 476, 479-80 (Fed. Cir. 1993); KSM Fastening Sys., Inc. v. H.A. Jones Co., 776 F.2d 1522, 1526 (Fed. Cir. 1985).  The clause is equally necessary in this context, and it similarly not subject to challenge on grounds of undue vagueness.  The Court therefore concludes that the order regarding future royalties is not contrary to law or unsupported by the evidence introduced at trial and in the proceedings before the Court regarding the future royalties award.

For the reasons set forth above, the Court DENIES Globus's motion for judgment as a matter of law, for a new trial, and for remittitur.

IT IS SO ORDERED.

SIGNED this 27th day of October, 2014.


_____
WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE